576 F.2d 145
 SAC AND FOX TRIBE OF the MISSISSIPPI IN IOWA, Appellant,
and
United States
v.
Les LICKLIDER, Chairman, State Conservation Commission,
Thomas A. Bates, Jim D. Bixter, John G. Link, Carolyn T.
Lumbard, Herbert T. Reed, and John Thompson, members of the
State Conservation Commission, Fred A. Priewart, Executive
Director, State Conservation Commission, and Kenneth Kakac,
Superintendent of Law Enforcement, Hunting and Fishing, Appellees.
 Nos. 77-1534, 77-1595.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 15, 1978
Decided May 12, 1978.
Rehearing Denied June 7, 1978.
 
 John Wabaunsee, Native American Rights Fund, Boulder, Colo. (argued) and Merle Royce, Marshalltown, Iowa, on brief, for Sac and Fox Tribe.
 John J. Zimmerman (argued), Edmund B. Clark, Attys., Land and Natural Resources Div., App. Section, Dept. of Justice, Washington, D. C., and James W. Moorman, Asst. Atty. Gen., Washington, D. C., on brief, for United States.
 James C. Davis, Asst. Atty. Gen., Des Moines, Iowa (argued) and Richard C. Turner, Atty. Gen., Des Moines, Iowa, on brief, for appellees.
 Before GIBSON, Chief Judge, STEPHENSON, Circuit Judge, and BECKER,* Senior District Judge.
 STEPHENSON, Circuit Judge.
 
 
 1
 This case presents the question of whether the state of Iowa has jurisdiction to regulate hunting, fishing and trapping by members of the Sac and Fox Tribe of the Mississippi in Iowa (Tribe) on a tract of land in Tama County, Iowa, occupied by the Tribe.
 
 
 2
 The Tribe presently resides on a 3,000 acre tract of land in Tama County, Iowa, which is held in trust by the United States for the use and benefit of the Tribe. In response to recent arrests of Tribe members by Iowa officials for violation of Iowa fish and game laws, the Tribe brought this action below. The United States brought a similar action and the two cases were consolidated. In essence, the plaintiffs sought declaratory and injunctive relief to the effect that Iowa has no jurisdiction to regulate hunting, fishing and trapping by Tribe members on the tract of land occupied by the Tribe. The cases were considered by the district court[1] on agreed-to stipulations of fact with the single exception as to whether some Sac and Fox Indians remained in Iowa between the years 1845 and 1856. The district court, on May 6, 1977, concluded that Iowa had jurisdiction to regulate hunting, fishing and trapping on the Tama tract and accordingly dismissed the consolidated actions. These appeals by the Tribe and the United States followed.
 
 I.
 
 3
 We begin with the recognized principle that: "Federal Indian law is a subject that cannot be understood if the historical dimension of existing law is ignored." United States v. Erickson, 478 F.2d 684, 686 (8th Cir. 1973), quoting from F. Cohen, Handbook of Federal Indian Law, XIII (Introduction by N. Margold) (1942). Prior to the year 1700 the Sac and Fox Tribes were distinct separate tribes residing in what is now central Wisconsin. As a result of war between the Fox and the French in the early 18th Century, the Fox were reduced in number and formed a loose confederation with the Sac. By 1800 the Sac and Fox had established villages along the Mississippi River in what is now Iowa and Illinois. Hunting, fishing and trapping took them as far west as central Iowa.
 
 
 4
 The Sac were first recognized by the United States in the Treaty of Jan. 9, 1789, 7 Stat. 28, 31 (1846), when the United States received the Sac into its friendship and protection. The Sac and Fox were jointly recognized in the Treaty of Nov. 3, 1804, 7 Stat. 84 (1846), in which much of what later became Illinois, Wisconsin and Missouri was ceded to the United States in exchange for certain payments and guarantees. In a series of treaties from 1804 through 1842, the Sac and Fox ceded other portions of their lands to the United States in exchange for payments, annuities and services.
 
 
 5
 In 1842 the Sac and Fox Tribe ceded all its land west of the Mississippi River (which includes the present Tama tract in Iowa) to the United States and agreed to move to a reservation located in what is now the state of Kansas. The move was to be accomplished within three years after the treaty date.[2] Many members of the Fox Tribe and some members of the Sac Tribe who agreed to move to the reservation in Kansas pursuant to the 1842 treaty became dissatisfied with the Kansas reservation and returned to Iowa.[3] In 1856 the Iowa legislature consented to the continued residence of the Sac and Fox then in Iowa and urged the United States to pay these Indians their proportionate annuities under the various treaties with the Sac and Fox Tribe. 1854-1857 Iowa Laws ch. 30 (5th Extra Gen. Assembly). The Tribe purchased a small tract of land in 1857 and title was taken by the governor of Iowa in trust for the Indians.
 
 
 6
 In 1865 the federal government sent an Indian agent to Iowa to supervise the Tribe. In 1867 Congress approved the payment of the 1842 treaty annuities to the Tribe in Iowa "so long as they are peaceful and have the assent of the government of Iowa to reside in that State." Act of Mar. 2, 1867, ch. 173, 14 Stat. 492, 507 (1868). Additionally in 1867 another treaty was negotiated with the Sac and Fox Tribe which required each absent member to move onto the reservation in the Indian Territory or lose his right to funds arising under all treaties with the Sac and Fox. The Tribe in Iowa was specifically exempted from this requirement. Treaty of Oct. 14, 1868, 15 Stat. 495, 504 (1869).
 
 
 7
 Between 1856 and 1896,[4] the Tribe acquired more land in Tama County with funds generated through the sale of pelts and horses, charitable contributions, and treaty annuities. By 1896, the governor of Iowa held the title to 2,720 acres of land in trust for the benefit of the Tribe. The Indian agent held the title to an additional 280 acres as trustee for the benefit of the Tribe.
 
 
 8
 In 1896 Iowa tendered exclusive jurisdiction over the Tribe and their lands held in trust for them to the United States, with the following exception:
 
 
 9
 Nothing contained in this act shall be so construed as to prevent on any of the lands referred to in this act the service of any judicial process issued by or returnable to any court of this state or judge thereof, or to prevent such courts from exercising jurisdiction of crimes against the laws of Iowa committed thereon either by said Indians or others, or of such crimes committed by said Indians in any part of this state * * *.
 
 
 10
 1894-1897 Iowa Laws ch. 110 (26th Extra Gen. Assembly). The United States accepted this tender, stating in part:
 
 
 11
 That the United States hereby accepts and assumes jurisdiction over the Sac and Fox Indians of Tama County, in the State of Iowa, and of their lands in said State, as tendered to the United States by the act of the legislature of said State passed on the sixteenth day of January, eighteen hundred and ninety-six, subject to the limitations therein contained * * *.
 
 
 12
 Act of June 10, 1896, ch. 398, 29 Stat. 321, 331 (1897).
 
 
 13
 In 1937 the Tribe adopted a constitution and bylaws pursuant to the Indian Reorganization Act of 1934, 25 U.S.C. § 461 et seq. In 1948, Congress conferred concurrent criminal jurisdiction on the state over offenses committed "by or against Indians on the Sac and Fox Indian Reservation" located in Iowa. Act of June 30, 1948, ch. 759, 62 Stat. 1161.[5] Finally in 1967, the Iowa Legislature acted to assume civil jurisdiction over actions involving Indians arising "within the Sac and Fox Indian settlement in Tama county" to the extent that such jurisdiction was available under the federal Act of Aug. 15, 1953, ch. 505, 67 Stat. 588, 589. See Iowa Code § 1.12.
 
 II.
 
 14
 The starting point for our analysis is the question of whether the land in Tama County presently occupied by the Tribe is a reservation. Both the Tribe and the United States contend it is, while the state of Iowa strenuously argues to the contrary.
 
 
 15
 As previously stated, in the Treaty of Oct. 11, 1842, the Sac and Fox Tribe ceded all its land west of the Mississippi River (which includes the Tama tract) to the United States and agreed to move to a reservation located in what is presently the state of Kansas. In this regard the language of the treaty is unequivocal:
 
 
 16
 The confederated tribes of Sacs and Foxes cede to the United States, forever, all the lands west of the Mississippi river, to which they have any claim or title, or in which they have any interest whatever * * *.
 
 
 17
 Treaty of Oct. 11, 1842, 7 Stat. 596 (1846). It is clear from the treaty language that at least by 1845, when the Sac and Fox were required to be moved from the ceded land, no reservation existed in Iowa.
 
 
 18
 It is equally clear, however, that as early as 1865 the United States began to treat the Tama tract occupied by the Tribe as a de facto reservation. Cf. Mattz v. Arnett, 412 U.S. 481, 490, 93 S.Ct. 2245, 37 L.Ed.2d 92 (1973). For example, in 1865 the federal government sent a special Indian agent to Tama and established a special agency for the Tribe, which continues to the present date. In the Act of Mar. 2, 1867, the United States approved the payment of the 1842 treaty annuities to the Tribe in Iowa. Furthermore, in the Treaty of Oct. 4, 1868, the tribal members living in Iowa were explicitly excepted from the requirement of rejoining the full Sac and Fox Tribe. From at least 1874, the Bureau of Indian Affairs expended money for the education of members of the Tribe, including the construction of a boarding school in Toledo, Iowa. These early actions by the federal government demonstrate that the United States recognized the Tribe in Iowa and dealt with them comparably to the Sac and Fox located on the Kansas reservation.
 
 
 19
 Any doubt was eliminated by the federal government in 1896, when the United States accepted and assumed "jurisdiction over the Sac and Fox Indians of Tama County" and their land. Act of June 10, 1896, ch. 398, 29 Stat. 321, 331 (1897). As one court stated in 1901:
 
 
 20
 (I)t must be held that the Indians residing in Tama county are tribal Indians residing on lands purchased for their benefit with the consent of the state, which lands constitute a reservation under the control of the United States in all matters pertaining to the domestic relations of the Indians, and, furthermore, that their status as tribal Indians is not based upon the act of the general assembly of Iowa just cited, but grows out of the fact that they are a part of the confederated tribes of Sacs and Foxes, between whom and the national government the relation of wards or dependents had been recognized and existed long before the state of Iowa was organized, and which condition of dependency has never been changed by any act of the national government.
 
 
 21
 Peters v. Malin, 111 F. 244, 251 (C.C.N.D.Iowa 1901).
 
 
 22
 Since 1897, the Bureau of Indian Affairs has expended funds for the Tribe in the areas of social services, land management, employment assistance, health services, including water and sanitation, police services, and education.
 
 
 23
 Finally, in the Act of June 30, 1948, Congress specifically referred to the Tama tract when it spoke of "offenses committed by or against Indians on the Sac and Fox Indian Reservation * * *." (Emphasis added.)The state argues that the Tama tract cannot be a reservation since no specific treaty, statute or executive order has created a reservation. However, as stated years ago by the Supreme Court:
 
 
 24
 (I)n order to create a reservation, it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes.
 
 
 25
 Minnesota v. Hitchcock, 185 U.S. 373, 390, 22 S.Ct. 650, 657, 46 L.Ed. 954 (1902). See United States v. White, 508 F.2d 453, 456-57 (8th Cir. 1974). Thus, we are persuaded that the land located in Tama County and occupied by the Tribe constitutes an Indian reservation.[6]
 
 III.
 
 26
 The resolution of the "reservation" question, however, does not terminate this court's inquiry. In our opinion we must further look to the applicable treaties and statutes to determine the limit of the state's power on the Tama reservation.
 
 
 27
 A state has initial authority to regulate the taking of fish and game by reason of its police power. Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896). The federal government, however, may preempt state control over fish and game by executing a valid treaty. Asakura v. City of Seattle, 265 U.S. 332, 341, 44 S.Ct. 515, 68 L.Ed. 1041 (1924); Missouri v. Holland, 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920). " Consequently, the state may enact and enforce no statute or regulation in conflict with treaties in force between the United States and the Indian nations." United States v. State of Washington, 520 F.2d 676, 684 (9th Cir. 1975), cert. denied, 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). In the instant case the issue is whether the federal government, through treaties and statutes, has preempted Iowa's regulation of the Tribe's hunting, fishing and trapping on the Tama reservation.
 
 
 28
 It is important to note at the outset that the relevant treaties and statutes are to be read with the tradition of Indian sovereignty in mind. McClanahan v. Arizona State Tax Comm'n, 411 U.S. 164, 173, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). The Indian sovereignty doctrine can be traced to Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 560, 8 L.Ed. 483 (1832), where Mr. Chief Justice Marshall stated the following vis-a-vis Georgia's power over the Cherokee nation:
 
 
 29
 The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force, and which the citizens of Georgia have no right to enter, but with the assent of the Cherokees themselves, or in conformity with treaties, and with the acts of congress.
 
 
 30
 Several decades later the Indian sovereignty doctrine with its concomitant jurisdictional limit on the reach of state law was articulated by the Supreme Court as follows:
 
 
 31
 The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes.
 
 
 32
 United States v. Kagama, 118 U.S. 375, 384-85, 6 S.Ct. 1109, 1114, 30 L.Ed. 228 (1886).
 
 
 33
 The Indian sovereignty doctrine, however, has not remained static over the years. As Mr. Justice White stated:
 
 
 34
 Generalizations on this subject have become particularly treacherous. The conceptual clarity of Mr. Chief Justice Marshall's view in Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 556-561 (1832), has given way to more individualized treatment of particular treaties and specific federal statutes * * * as they, taken together, affect the respective rights of States, Indians, and the Federal Government.
 
 
 35
 Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148, 93 S.Ct. 1267, 1270, 36 L.Ed.2d 114 (1973). See Organized Village of Kake v. Egan, 369 U.S. 60, 71-76, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962). The doctrine's evolution was further described in another case by Mr. Justice Marshall, as follows:
 
 
 36
 Finally, the trend has been away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption. * * * The modern cases thus tend to avoid reliance on platonic notions of Indian sovereignty and to look instead to the applicable treaties and statutes which define the limits of state power. Compare, e.g., United States v. Kagama, 118 U.S. 375, (6 S.Ct. 1109, 30 L.Ed. 228) (1886), with Kennerly v. District Court, 400 U.S. 423, (91 S.Ct. 480, 27 L.Ed. 507) (1971).
 
 
 37
 McClanahan v. Arizona State Tax Comm'n, supra, 411 U.S. at 172, 93 S.Ct. at 1262 (footnotes omitted).
 
 
 38
 In turning to the treaties and statutes before us, it must be remembered that although we have earlier stated that the Tama tract is in fact a reservation, we so held because of the various actions taken by the federal government in relation to the Tribe. It is abundantly clear that the reservation was not created by a specific treaty. Therefore, some of the maxims to be applied in the interpretation of treaties with Indian tribes are generally inapplicable here.[7]
 
 
 39
 As stated earlier, the Treaty of Oct. 11, 1842, is unequivocal in that the confederated tribes of Sacs and Foxes ceded to the United States all the lands west of the Mississippi River in which they had any claim or title or interest. The treaty further called for the complete relocation of the confederated tribes to a reservation in what is now the state of Kansas. We are persuaded that by this treaty the confederated tribes relinquished their aboriginal rights to hunt and fish on the present Tama reservation.
 
 
 40
 The United States contends, however, that the Tribe's hunting, fishing and trapping rights were necessarily rejuvenated as a result of the subsequent creation of the Tama reservation. Congressional actions following the 1842 treaty convince us otherwise. For example, in 1867 Congress approved the payment of the 1842 treaty annuities to the Tribe "so long as they are peaceful and have the assent of the government of Iowa to reside in that State." Act of Mar. 2, 1867, ch. 173, 14 Stat. 492, 507 (1868). Although the scope of Iowa's control and jurisdiction over the Tribe are not clear from this language, it is apparent that at least in 1867 Congress contemplated some control by Iowa over the Tribe.
 
 
 41
 It is important that in 1896 Iowa tendered exclusive jurisdiction over the Tribe and their lands to the United States with the proviso that "(n)othing contained in this Act shall be so construed as * * * to prevent such (Iowa) courts from exercising jurisdiction of crimes against the laws of Iowa committed (on the Tribe's land) * * *." 1894-1897 Iowa Laws ch. 110 (26th Extra Gen. Assembly). The federal government accepted this tender of jurisdiction pursuant to the act of the Iowa legislature "subject to the limitations therein contained." Act of June 10, 1896, ch. 398, 29 Stat. 321, 331 (1897). In construing these two acts, a federal court has stated:
 
 
 42
 (A)s it was clearly contemplated that these Indians would continue to reside as a tribe upon their lands in Tama county, and would be brought in some respects into contact with the people of Iowa, it was deemed wise and proper to reserve, for the protection of the latter, jurisdiction in certain particulars over the lands of the reservation, and jurisdiction to punish crimes against the people of Iowa; and these are the purposes of section 3 of the act, which reserves to the state * * * jurisdiction in the courts of the state over crimes against the laws of Iowa committed on the reservation by Indians * * *.
 
 
 43
 The state of Iowa has the right to exercise its police powers for the protection of its own citizens, but it cannot regulate the affairs of the tribal Indians in their relations to each other, for in these relations the Indians are under the control and protection of the national government.
 
 
 44
 Peters v. Malin, supra, 111 F. at 253-54, 255.
 
 
 45
 A fair reading of the two acts leads us to the conclusion that in 1896 Congress consented to Iowa's jurisdiction over crimes committed on the Tama tract by members of the Tribe. Although the United States argues that violation of state fish and games laws are "victimless" crimes at most, we are constrained to find that nevertheless they are still crimes.[8]
 
 
 46
 Finally, we are convinced that this court's recent decision in Youngbear v. Brewer, supra, supports our holding in the instant case. In Youngbear, we affirmed the lower court's decision[9] that in the Act of June 30, 1948, Congress granted jurisdiction generally to the state of Iowa over crimes committed by or against Indians on the Tama reservation, with the exception of those crimes listed in 18 U.S.C. § 1153 (Federal Major Crimes Act). As to those crimes, the federal courts retained exclusive jurisdiction. Because a violation of Iowa's fish and game laws does not fall within the exception noted above, it follows that Congress has recognized Iowa's jurisdiction to enforce its fish and game laws on the Tama reservation.
 
 
 47
 The Tribe argues that Menominee Tribe of Indians v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968), requires that statutes affecting jurisdiction over reservation Indians must specifically address hunting, fishing and trapping rights before they are affected. In that case the Supreme Court held that the Menominee Tribe was granted a reservation in Wisconsin by the Treaty of Wolf River in 1854, which included hunting and fishing rights. The Court further held that these rights were not extinguished by the Menominee Indian Termination Act of 1954, 68 Stat. 250, as amended, 25 U.S.C. §§ 891-902, even though the purpose of this Act was to end all federal supervision of the tribe and to substitute in its place state jurisdiction. The Court so held because of another statute passed by the same Congress, Public Law 280, 67 Stat. 588, as amended, 18 U.S.C. § 1162, which provided that: "Nothing in this section * * * shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof." (Emphasis added.)
 
 
 48
 In the instant case Congress did not specifically exempt the Tribe's hunting, fishing and trapping rights from state jurisdiction as it did in respect to all Indian country within the state of Wisconsin in 18 U.S.C. § 1162. To the contrary, Congress, in the Act of June 30, 1948, has given the state of Iowa jurisdiction over crimes committed by Indians on the Tama reservation with the exception of the major crimes listed in 18 U.S.C. § 1153. As the Supreme Court's conclusion in Menominee was based largely on 18 U.S.C. § 1162,[10] we do not find Menominee controlling.
 
 
 49
 In summary, we are persuaded that the federal government has created through its various actions, with the statutory consent and cooperation of the state of Iowa, a de facto reservation in Tama County, Iowa. The resolution of this issue, however, does not end our inquiry, for a state's power on a reservation is determined by the applicable treaties and statutes. Our reading of the 1842 treaty convinces us that the Tribe yielded up its aboriginal rights to hunt, fish and trap on the land. Furthermore, by statute, Congress acceded to Iowa's statutory withholding of jurisdiction over all crimes against the state, except those enumerated in the Federal Major Crimes Act. By its legislative actions, we are persuaded that Congress has recognized the state of Iowa's jurisdiction to enforce its fish and game laws on the reservation.
 
 
 50
 It is important to note that our decision today does not prevent the tribal members from hunting, fishing and trapping on the reservation. The tribal members, like other Iowa landowners, may in general hunt on their own land without purchasing a license, subject to laws governing seasons and limits. We only hold that the state may enforce its fish and game laws on the reservation in the same manner in which it enforces Iowa's fish and game laws against any Iowa landowner.
 
 
 51
 Accordingly, we affirm the judgment of the district court.
 
 
 52
 Affirmed.
 
 
 
 *
 The Honorable William H. Becker, Senior United States District Judge for the Western District of Missouri, sitting by designation
 
 
 [1]
 The Honorable Edward J. McManus, Chief Judge, United States District Court for the Northern District of Iowa
 
 
 [2]
 The Treaty of Oct. 11, 1842, 7 Stat. 596 (1846), provides in part:
 The confederated tribes of Sacs and Foxes cede to the United States, forever, all the lands west of the Mississippi river, to which they have any claim or title, or in which they have any interest whatever; reserving a right to occupy for the term of three years from the time of signing this treaty, all that part of the land hereby ceded which lies west of a line running due north and south from the painted or red rocks on the White Breast fork of the Des Moines river, which rocks will be found about eight miles, when reduced to a straight line, from the junction of the White Breast with the Des Moines.
 
 
 [3]
 As noted earlier, the only factual issue in the instant case was whether some Sac and Fox Indians remained in Iowa between 1845 and 1856. Although the district court found the resolution of this issue unnecessary to its decision of the instant case, an earlier decision had held that some scattered remnants had not gone to the new reservation in Kansas but had remained in Iowa following the 1842 treaty. See In re Lelah-Puc-Ka-Chee, 98 F. 429, 431 (N.D.Iowa 1899). It is clear that by 1856 some Sac and Fox were occupying land in Tama County, Iowa. In any event, we are in agreement with the district court that the resolution of this factual issue is not essential to our analysis
 
 
 [4]
 For a more detailed discussion of the history of the Tribe during this period, see Mr. Justice Holmes' discussion in Sac and Fox Indians of the Mississippi in Iowa v. Sac and Fox Indians of the Mississippi in Oklahoma, 220 U.S. 481, 482-90, 31 S.Ct. 473, 55 L.Ed. 552 (1911)
 
 
 [5]
 The Act of June 30, 1948, reads in pertinent part as follows:
 That jurisdiction is hereby conferred on the State of Iowa over offenses committed by or against Indians on the Sac and Fox Indian Reservation in that State to the same extent as its courts have jurisdiction generally over offenses committed within said State outside of any Indian reservation: Provided, however, That nothing herein contained shall deprive the courts of the United States of jurisdiction over offenses defined by the laws of the United States committed by or against Indians on Indian reservations.
 This court has recently interpreted this statute in Youngbear v. Brewer, 549 F.2d 74 (8th Cir. 1977), as preserving exclusive federal jurisdiction over offenses defined in 18 U.S.C. § 1153 (Federal Major Crimes Act), and as granting the state of Iowa jurisdiction over all other offenses.
 
 
 [6]
 The district court held below that the tract is "Indian Country" within the meaning of 18 U.S.C. § 1151. The Iowa Supreme Court has also held the tract to be "Indian Country" in light of its finding that this land was set apart for the use and occupancy of Indians. State v. Youngbear, 229 N.W.2d 728, 732 (Iowa), cert. denied, 423 U.S. 1018, 96 S.Ct. 455, 46 L.Ed.2d 3090 (1975). As discussed later in this opinion, we are persuaded that whatever label is placed on the tract, the relevant inquiry must still focus on the applicable treaties and statutes
 
 
 [7]
 For example, treaties with the Indians must be interpreted as they would have understood them. Choctaw Nation v. Oklahoma, 397 U.S. 620, 631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970); United States v. Shoshone Tribe of Indiana, 304 U.S. 111, 116, 58 S.Ct. 794, 82 L.Ed. 1213 (1938). Doubtful expressions are to be resolved in favor of the Indians. Oliphant v. Suquamish Indian Tribe, --- U.S. ---- at ---- n.17, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978); Bryan v. Itasca County, Minn., 426 U.S. 373, 392, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976); McClanahan v. Arizona State Tax Comm'n, supra, 411 U.S. at 174, 93 S.Ct. 1257; Carpenter v. Shaw, 280 U.S. 363, 367, 50 S.Ct. 121, 74 L.Ed. 478 (1930). Finally, treaties are to be construed "in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." Tulee v. Washington, 315 U.S. 681, 684-85, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942). See also Choctaw Nation of Indians v. United States, 318 U.S. 423, 432, 63 S.Ct. 672, 87 L.Ed. 877 (1943). It is also true that some of these maxims are applied in the interpretation of federal statutes. See Antoine v. Washington, 420 U.S. 194, 199, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). In the instant case we have applied the pertinent interpretive maxims to the congressional actions in question
 
 
 [8]
 Violations of the Iowa fish and game laws can result, upon conviction or a plea of guilty, in a $100 fine or 30 days in jail. See Iowa Code §§ 109.32, 109.119
 
 
 [9]
 See Youngbear v. Brewer, 415 F.Supp. 807 (N.D.Iowa 1976)
 
 
 [10]
 See Kimball v. Callahan, 493 F.2d 564, 567-69 (9th Cir.), cert. denied, 419 U.S. 1019, 95 S.Ct. 491, 42 L.Ed.2d 292 (1974)