ANTHONY S. EARL, Secretary Department of Natural Resources
Your predecessor requested my opinion on a number of issues pertaining to the Stockbridge-Munsee Indian Tribe. The request indicated that the Tribe was in the process of establishing hunting and fishing regulations which are to apply to all persons within the exterior boundary of the reservation. AS YOU know, most but not all of the questions contained in that request are currently in litigation.
In State v. Baker, et al., 76-C-356 (W.D. Wis.), (see related case, State of Wis. v. Baker, 464 F. Supp. 1377 (W.D. Wis. 1978)), the state requested a declaratory ruling on the authority of the Lac Courte Oreilles Tribe to promulgate and enforce hunting and fishing regulations on navigable waters within the exterior boundaries of the Lac Courte Oreilles Reservation. It is the policy of this office, when directly involved, not to comment on issues in litigation. Consequently, the questions relating to the jurisdiction of the Stockbridge-Munsee Tribe to promulgate and enforce hunting and fishing regulations *Page 73 
against Indians and non-Indians on navigable waters within reservation boundaries will not be addressed here. Thus, "land" as used herein does not include the bed of lakes or streams. This opinion is limited to consideration of the following questions:
 1. What are the boundaries of the Stockbridge Indian lands? Do these boundaries include the Towns of Bartelme and Red Spring in Shawano County?
 2. What "treaty rights" or other rights do the Stockbridge Indians have with regard to hunting, fishing and trapping?
 3. Do the Stockbridge Indians have any hunting, fishing and trapping rights in the Towns of Bartelme and Red Spring?
 4. Can the Stockbridge Indians legally establish hunting, fishing and trapping seasons of their own? If so, on what lands? To whom would these seasons apply?
 5. What, if any, enforcement authority do the Stockbridge Indians have to enforce hunting, fishing, and trapping laws against both Indians and non-Indians?
I. Stockbridge-Munsee Reservation Boundary
A determination of the current Stockbridge-Munsee Reservation boundary requires consideration of several treaties and federal statutes. Before considering in detail the relevant treaties and legislation, it would perhaps be helpful to set forth in general the events that caused the Stockbridge-Munsee to settle at their present location in Wisconsin. Such historical accounts provide a backdrop against which to read the relevant treaties and legislation as they affect reservation boundary questions.
The Stockbridge and Munsee Indians originally resided in the eastern part of the United States. As a result of the settlement of their land in the east, they were forced to move, eventually relocating in Wisconsin in the early 1800'S. Pursuant to an amendment to the 1831 Treaty with the Menominees (7 Stat. 342), the United States Government acquired approximately 46,000 acres of land on the east side of Lake Winnebago in a locality then known as Stockbridge, Wisconsin, for the use of the Stockbridge and Munsee Tribes.
Between 1831 and 1856 the Stockbridge and Munsee gave up or lost all their land located at Stockbridge, Wisconsin, through a series *Page 74 
of treaties and legislative enactments. In the Treaty of February 5, 1856 (11 Stat. 663), the last treaty between the United States and Stockbridge and Munsee, the remaining tribal land at Stockbridge, Wisconsin (together with seventy-two sections of land in Minnesota), was ceded to the United States. Article II provided in part:
 In consideration of such cession and relinquishment by said Stockbridges and Munsees, the United States agree to select as soon as practicable and to give them a tract of land in the State of Wisconsin, near the southern boundary of the Menominee reservation, of sufficient extent to provide for each head of a family and others lots of land of eighty and forty acres, as hereinafter provided, every such lot to contain at least one-half of arable land.
By treaty dated February 11, 1856 (11 Stat. 679), the United States acquired two towns of land from the Menominee Tribe "for the purpose of locating thereon the Stockbridge and Munsee Indians." Thus, Town 28 North, Range 13 East (Bartelme), and Town 28 North, Range 14 East (Red Spring), in Shawano County, Wisconsin, were acquired by the United States Government as a federal reserve for the use of the Stockbridge and Munsee Tribes.
The 1856 Treaty with the Stockbridge-Munsee provided for the allotment of reservation land among tribal members. This allotment policy was designed to transfer ownership of a particular parcel of land to each tribal member. The individual allottee was prohibited from transferring or selling the allotment by virtue of a restriction on alienation contained in the patent from the federal government. Not all land was to be allotted, however. Article III obligated the United States to reserve sufficient land for the "rising generation." Article IV authorized the expenditure of tribal moneys held by the United States in trust for the "building of roads leading to, and through said lands, to the erection of a school house, and such other improvements of a public character, as will be deemed necessary by the said Stockbridge and Munsee council."
Based on the 1856 Treaty and the historical events noted, it is my opinion that a reservation for the use of the Stockbridge and Munsee Indians coterminous with the present towns of Bartelme and Red Spring was thus created. It is also my opinion that subsequent early congressional legislation completely terminated the reservation status *Page 75 
of the tribal land thus set apart for the Stockbridge-Munsee in the 1856 Treaty but that later legislation reestablished the much smaller present reservation. I believe the following examination of such legislation, in view of the historical relationship between the United States and the Stockbridge-Munsee Tribe as reflected by court decisions that considered the effect of similar legislation, compels that conclusion.
A. Termination of the 1856 Reservation
By the Act of February 6, 1871 (16 Stat. 404), Congress provided "[t] hat the two townships of land . . . set apart for the use of the Stockbridge and Munsee tribe of Indians" were to be appraised and sold at public auction under direction of the Secretary of the Interior. The Secretary was also authorized "to reserve from sale a quantity of said lands not exceeding eighteen contiguous sections, embracing such as are now actually occupied and improved, and are best adapted to agricultural purposes, subject to allotment to members of the Indian party of said tribe."
The 1871 legislation was the first congressional enactment specifically directed toward reducing the size of the reservation as created by the 1856 Treaty. Virtually every section of the Act was concerned with dividing tribal assets in a manner which would accommodate the interest of the then two rival tribal factions, the "Indian" party and the "citizens" party.
The citizens party had consistently argued for the sale of tribal land and a per capita distribution of the proceeds therefrom, whereas the Indian party had consistently argued for the right to maintain tribal relations and to retain ownership of reservation land. (See, e.g., Senate Miscellaneous Documents, Report No. 1108, Vol. 5, 1891-92.)
To accommodate the interests of both groups, the 1871 legislation thus provided for the sale of all reservation land except eighteen sections which were reserved for the Indian party, thereafter to be known as the "Stockbridge Tribe of Indians," with part of the proceeds from such land sale to be distributed to members of the citizens party and the remaining funds deposited in a tribal account. Upon receiving their per capita payments, members of the citizens party would forever lose membership in the Tribe and all rights that flow therefrom. *Page 76 
Title to the entire eighteen sections, whether allotted or not, was to be held in trust by the United States for the Stockbridge Tribe. The reservation set apart for the use of the Stockbridge-Munsee in the 1856 Treaty was thus reduced to eighteen sections in the southern part of Town 28 North, Range 14 East (Red Spring), and the remaining eighteen sections in the north part, together with Town 28 North, Range 13 East (Bartelme), were placed upon the market and sold.
Clearly, the eighteen sections reserved for the Indian party continued to be a reservation, albeit diminished in size, which reservation status was recognized by both the United States and the courts. See United States Gardner, 189 F. 690 (E.D. Wis. 1911). Legislation in 1893 (27 Stat. 744) and 1906 (27 Stat. 745), however, made further provisions for the allotment of the remaining eighteen sections of reservation lands. The effect of that legislation on continued reservation status is less clear, but it nevertheless indicates, in my opinion, congressional intent to completely dissolve the reservation status of all remaining Stockbridge-Munsee land.
The 1893 legislation provided that all tribal members:
 [W]ho entered into possession of land under the allotment of 1856 [the Treaty] and of 1871, and who by themselves or by their lawful heirs have resided on said lands continuously since, are hereby declared to be owners of such lands in fee simple, in severalty, and the government shall issue patents to them therefor.
The Act also declared that certain individuals who had been excluded from membership in the Tribe by the 1871 legislation were in fact members of the Tribe and the Secretary of the Interior was directed to prepare a new enrollment of the Tribe to include such individuals.
The Act of June 21, 1906, provided for the allotment of all the remaining lands within the Stockbridge-Munsee Reservation to tribal members in fee simple without condition. The Act also authorized the Secretary of the Interior to acquire additional lands, if necessary, to complete the allotment provision with the proviso that those tribal members who were to receive allotments from such land had the option of accepting a cash payment instead of the allotment. *Page 77 
In Gardner, the Federal District Court for the Eastern District of Wisconsin considered whether the reservation survived the Act of June 21, 1906. The court construed the 1906 legislation as directing the Secretary of the Interior to proceed in the usual way to make allotments to tribal members and thereafter issue patents in fee simple to the individual allottees. The court concluded:
 Up to the time this crime is alleged to have been committed, the reservation remained as a physical and legal fact, notwithstanding the promise of Congress to grant patents in fee simple. There was no change of occupancy. The defendant still lived within the limits of the reservation under the charge of an Indian agent, and to a certain extent the tribal relations were continued. So that the relation between the defendant and the government would not seem to have been changed until the allotments had been approved, or perhaps until the patents had been actually issued. It is not necessary in this case to determine at which of these dates the reservation expired.
189 F. at 696. The court observed, however, that such allotments had been made and were approved by the Secretary of the Interior on January 1, 1910. Patents were delivered on April 4, 1910. Since the alleged crime had occurred in 1909 when the reservation still clearly existed, the court concluded it had jurisdiction.
In United States v. Anderson, 225 F. 825 (E.D. Wis. 1915), the same court again considered the effect of the 1906 legislation on reservation status. The court observed:
 When this act is read in the light of the treaty, the successive congressional and executive steps affecting the government's relation to this tribe, its opening declaration, that the enrolled members who have not heretofore received patents "in their own right, shall be given allotments of land, and patents therefor in fee simple," evinces conclusively, so it seems to me, the legislative purpose to surrender, finally, any reserved discretionary power of the government over lands to be given to these Indians.
225 F. at 830.
In support of its conclusion, the court noted that prior to 1900, the Stockbridge Tribe petitioned the United States Government, acting through its Indian office, for a final dissolution of the Tribe and a *Page 78 
distribution of the tribal property, the latter to include the patenting of the lands in fee simple. Based on that petition, the Tribe and the United States apparently entered into an agreement, signed by a majority of the adult male members, entitled "Proposed Plan of Settlement with the Stockbridge and Munsee Tribe of Indians." That agreement, the court concluded, was the basis of the Act of June 21, 1906, which incorporated almost verbatim, major portions of the agreement. (See discussion at 225 F. 828-29.) Agreements, such as the agreement with the Stockbridge, which produce legislation are considered significant by courts in determining congressional intent. For example, the Court in DeCoteau v. District County Court, 420 U.S. 425 (1975), considered the effect of similar legislation and surrounding circumstances on the Lake Traverse Reservation.
The issue in DeCoteau was whether the Lake Traverse Reservation, created by an 1867 treaty between the United States and the Sisseton and Wahpeton Band of Sioux Indians, was terminated and returned to the public domain by the Act of March 3, 1891 (26 Stat. 1035). The 1891 Act ratified a previously negotiated agreement to which a tribal majority consented, in which the Tribe agreed to cede, sell, relinquish and convey to the United States all the land within the reservation remaining after additional allotments had been made. The Court observed that the 1891 Act which incorporated that agreement did not merely open the reservation lands to settlement, it also appropriated and vested in the Tribe a sum certain — $2.50 per acre — in payment for the express cession and relinquishment of "all" of the Tribe's "claim, right, title and interest" in the unallotted land.
To determine the effect of the 1891 effect on reservation status, the Court considered the guidelines it had established in earlier cases.
 This Court does not lightly conclude that an Indian reservation has been terminated. "[W]hen Congress has once established a reservation all tracts included within it remain a part of the reservation until separated therefrom by Congress.". . . The congressional intent must be clear, to overcome "the general rule that `[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.'". . . Accordingly, the Court requires that the "congressional determination to terminate . . . be expressed on the face of the Act or be clear from the surrounding circumstances and legislative history.". . . In *Page 79 
particular, we have stressed that reservation status may survive the mere opening of a reservation to settlement, even when the moneys paid for the land by the settlers are placed in trust by the Government for the Indians' benefit.
420 U.S. at 444 (citations omitted).
The Court held that the 1891 Act together with its legislative history and the surrounding circumstances all pointed unmistakably to the conclusion that the original Lake Traverse Reservation was partially terminated in 1891.
The negotiations leading to the Lake Traverse agreement, which was ratified by the 1891 Act, together with the unqualified return of unallotted land to the public domain, were major factors in the Court's determination. The Court cited various materials, including debates regarding congressional reaction to the proposed agreement, in support of its finding that both the Tribe and the federal government were satisfied that retention of allotments would provide an adequate fulcrum for tribal affairs.
As United States v. Gardner, 189 F. 690 (E.D. Wis. 1911), andUnited States v. Anderson, 225 F. 825 (E.D. Wis. 1915), indicate, essentially the same circumstances surrounded the complete termination of the reservation status of Stockbridge-Munsee land as were found to be controlling in DeCoteau. The only significant difference is that only part of the Lake Traverse Reservation was terminated.
Based on a consideration of these cases and the entire history of the legislative and executive action with respect to the Stockbridge-Munsee Reservation, it is my opinion that Congress intended to abolish the reservation status of the remaining eighteen sections of Stockbridge-Munsee land when the land was finally allotted and patents in fee simple were delivered to members of the Tribe in 1910. This conclusion finds further support in the fact that after 1910 the federal government, through the Bureau of Indian Affairs, apparently ceased to consider the allotted land a reservation. After 1910 the only consistent reference to the Stockbridge-Munsee in the Commissioner of Indian Affairs' reports to the Secretary of Interior concern educational benefits provided to individual tribe members. *Page 80 
B. Reestablishment of the Reservation
By the mid 1930'S less than 200 acres of the eighteen sections allotted remained in Stockbridge-Munsee ownership. In 1934, in response to the apparent failure of the allotment policy which had reduced Indian landholdings nationally to less than 40 million acres, Congress enacted the Indian Reorganization Act (48 Stat. 984, 25 U.S.C. sec. 461, et seq.). This Act provided a statutory basis for the reestablishment of Indian reservations and the reorganization of Indian tribes as governmental entities. Specifically, it gave the Secretary of the Interior the authority to purchase lands for the purpose of providing an expanded land base for Indian tribes (25 U.S.C. sec. 465), and to proclaim new Indian reservations where none existed previously (25 U.S.C. sec. 467). Pursuant to this Act, approximately 2200 acres of former Stockbridge Reservation lands within the original 1856 reservation boundaries were reacquired for the use and benefit of the Tribe. In addition, pursuant to Title II of the National Industrial Recovery Act of June 16, 1933 (48 Stat. 300), the Emergency Relief Appropriation Act of April 8, 1835 (49 Stat. 115) and sec. 55 of the Act of August 24, 1935 (49 Stat. 750, 781), approximately 13,077 acres of submarginal land also located within the original 1856 reservation boundaries were purchased by the United States Government for the use of the Stockbridge-Munsee Indians. In 1972, Congress declared that the submarginal lands were to be held in trust for the Stockbridge-Munsee Tribe and were to be part of their reservation (86 Stat. 795).
The present reservation thus includes approximately 13,077 acres of submarginal land plus the 2200 acres of land purchased pursuant to the 1934 Indian Reorganization Act. These reservation lands are not contiguous and are located in both the Town of Red Spring and the Town of Bartelme. A map showing the location of the present reservation lands is attached hereto as Appendix A.
II. Stockbridge-Munsee Hunting and Fishing Rights
Whether a tribe has the right to hunt and fish free of state regulation depends upon whether the treaty, legislation, or executive order which established the reservation guaranteed the Tribe such rights. In my opinion, the creation of the Stockbridge-Munsee Reservation in 1856, which included all of the Towns of Bartelme and Red Spring, guaranteed the Tribe hunting and fishing rights. It is also my opinion, *Page 81 
however, that termination of Stockbridge-Munsee Reservation land status in 1910 effectively terminated the Tribe's hunting and fishing rights on such lands but that the Tribe reacquired the exclusive right to hunt and fish free of state regulation on present tribal land when the reservation was reestablished.
Tribal hunting and fishing rights are property rights owned collectively by the Tribe; individual rights are derived from membership in the Tribe. Washington v. Washington State, Etc.,99 S.Ct. 3055, 3071 (1979); Whitefoot v. United States, 293 F.2d 658
(Ct.Cl., 1961), cert. denied 369 U.S. 818 (1962). See alsoCohen, Handbook of Federal Indian Law, at 37, 285, 366 (1942 ed.) and Department of Interior Federal Indian Law, at 440, 496, 588-89, 750 note 21 (1958). It has been held that such a right is a profit a prendre[1] and, as such, an interest in real property. Van Camp v. Menominee Enterprises, Inc.,68 Wis.2d 332, 343, 228 N.W.2d 664 (1975). The sale of tribal land without reserving hunting and fishing rights on such land terminates exclusive rights thereon. Id. See South Dakota v. Hero, ___ S.D. ___, 282 N.W.2d 70 (1979), and United States v. State ofMinn., 466 F. Supp. 1382 (D. Minn. 1979).
The court in Van Camp intimated that purchasers of tribal lands would have the right to hunt on their own land, subject presumably to governmental regulation. The court, however, did not consider whether the state or the tribe or both would have jurisdiction to regulate hunting and fishing activities on such property. Nor did the court consider whether such land sales terminated all tribal hunting and fishing rights on such land or only exclusive rights and thus left open the question of whether a tribe would continue to enjoy rights in common with the purchasers of such land. Since it is my opinion that the Stockbridge-Munsee Tribe did not retain the right to hunt and fish free of state regulation on the land that originally composed the 1856 reservation, it is not necessary to address these questions here. *Page 82 
In concluding that the Tribe did not retain any special hunting and fishing rights on the 1856 reservation lands, I am mindful of the Supreme Court's reluctance to find termination of treaty-protected rights where reservation land status is only partially terminated.
In Menominee Tribe v. United States, 391 U.S. 404, and Antoinev. Washington, 420 U.S. 194 (1975), the Court made clear that the termination of reservation status alone will not necessarily be considered an abrogation of rights secured to Indian tribes through treaty or legislation. The facts in Menominee Tribe are substantially different, however, than the facts surrounding the termination of the Stockbridge-Munsee Reservation. When Menominee termination became effective in 1961, title to the Menominee tribal land base was transferred from the United States to a Wisconsin corporation. Not only did the land base remain substantially intact following termination, but the Tribe's government structure and intra-tribal relations also remained substantially unaffected by the termination legislation.
In contrast, following the issuance of patents to Stockbridge-Munsee tribe members in fee simple in 1910, virtually all tribal relations ended. The communal ownership of tribal land was effectively ended and the Stockbridge-Munsee tribal government effectively ceased to function until reorganization. With the termination of reservation status, the sale of Stockbridge-Munsee land by the United States, and the allotment of remaining land to Tribe members in severalty with patents in fee simple, any exclusive tribal right to hunt upon such lands was lost. Van Camp. Fee simple ownership of all reservation land, together with the termination of reservation status, also caused such land and its owners to become subject to the general civil and criminal laws of Wisconsin. See25 U.S.C. sec. 349; Gardner at 695; compare, however, Mattz v. Arnett,412 U.S. 481 (1973) with McGeehan v. Ashland County, 192 Wis. 177,212 N.W. 283 (1927). Thereafter, but only until the Stockbridge-Munsee Reservation was reestablished in 1934, Tribe members were subject to the same state regulation of hunting and fishing activities as were other persons.
As already discussed, the 1934 Indian Reorganization Act (48 Stat. 984, 25 U.S.C. sec. 461, et seq.) provided a statutory basis for the reestablishment of Indian reservations and the reorganization of Indian tribes. The Act authorized the Secretary of the Interior to acquire any interest in lands, water rights or surface rights to lands, within or without existing reservations, for the purpose of providing *Page 83 
lands for Indians (25 U.S.C. sec. 465). The Act also authorized the Secretary to proclaim new Indian reservations on lands thus acquired or to add such lands to existing reservations.
It is my opinion that the land acquired by purchase for the use and benefit of the Stockbridge-Munsee Tribe pursuant to the 1934 Indian Reorganization Act and proclaimed by the Secretary of the Interior to be an Indian Reservation, together with the federal surplus land added to that reservation by the Act of October 9, 1972, reestablished the Tribe's exclusive right to hunt and fish on such land. The 1934 Act provides that "lands added to existing reservations shall be designated for the exclusive use of Indians entitled to enrollment or by tribal membership to residence at such reservations." (25 U.S.C. sec. 467.)
In 56 Op. Att'y Gen. 11, 19 (1967), it is stated that:
 There can be no distinction between lands occupied by Indian tribes which were later recognized by the federal government as being Indian lands, and the lands which were specifically granted to the Indians by the federal government. When the United States established Indian reservations, whether by treaty or otherwise, the rights of occupancy conveyed to the Indians included the right to hunt, fish and trap free from state conservation laws.
See also Alaska Pacific Fisheries v. United States, 248 U.S. 78
(1918); Antoine; Mattz; United States v. John, 437 U.S. 478, (1978); United States v. Walker River Irr. Dist., 104 F.2d 334
(9th Cir. 1934). Compare State v. Shepard, 239 Wis. 345,300 N.W. 905 (1941) with Sac Fox Tribe of Mississippi in Iowa v.Licklider, 576 F.2d 145 (8th Cir. 1978).
It follows that members of the Stockbridge-Munsee Tribe have the exclusive right to hunt and fish on land held in trust for the Tribe which constitutes the present reservation. As already noted, the question of whether Wisconsin tribes have exclusive rights on navigable waters located within or adjacent to reservations in Wisconsin is currently in litigation. Consequently, this opinion will not address the issues related to navigable waters. Nor does this opinion address any issue involving state or tribal regulation of hunting and fishing activities on lands located within reservations that are owned in fee by non-tribe members. *Page 84 
III. Tribal Regulation of Hunting and Fishing Activities
The exclusive right to hunt and fish on tribal trust land strongly implies the right to regulate such activities by the Tribe and the United States. Whether the state also has jurisdiction to regulate hunting and fishing on such land is unsettled.
A tribe's governmental powers provide a basis for regulation within reservation boundaries. For a general discussion of tribal governmental powers, see McClanahan v. Arizona Tax Commission,411 U.S. 164 (1973); United States v. Mazurie, 419 U.S. 544
(1975); Iron Crow v. Oglala Sioux Tribe of Pine Ridge Res.,231 F.2d 89 (8th Cir. 1956).
As I have indicated in other opinions Indian tribes are recognized as legitimate governmental entities. See, e.g., OAG 61-79; 66 Op. Att'y Gen. 115 (1977); 65 Op. Atty Gen. 276 (1976). As such, "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." United Statesv. Wheeler, 435 U.S. 313, 322-23 (1978). Clearly, the governmental power of Indian tribes to exercise jurisdiction over communal hunting and fishing rights was not withdrawn by implication when Indian tribes became dependent nations. See Wheeler, 435 U.S. at 326. Although Congress has the power to strip tribes of their remaining sovereignty, until Congress acts to do so, Indians "remain a separate people, with the power of regulating their internal and social relations." Id. at 322 (quoting United States v. Kagama, 118 U.S. 375, 381-82 (1886)).
Recognizing inherent tribal sovereignty, the 1934 Indian Reorganization Act included a provision for the reorganization of Indian tribes as governmental entities. Section 16 of the Act (25 U.S.C. § 476), provides:
 Any Indian tribe, or tribes, residing on the same reservation, shall have the right to organize for its common welfare, and may adopt an appropriate constitution and bylaws, which shall become effective when ratified by a majority vote of the adult members of the tribe, or of the adult Indians residing on such reservation, as the case may be, at a special election authorized and called by the Secretary of the Interior under such rules and regulations as he may prescribe. . . . *Page 85 
 In addition to all powers vested in any Indian tribe or tribal council by existing law, the constitution adopted by said tribe shall also vest in such tribe or its tribal council the following rights and powers: . . . to prevent the sale, disposition, lease, or encumbrance of tribal lands, interests in lands, or other tribal assets without the consent of the tribe; and to negotiate with the Federal, State and local Governments.
Pursuant thereto, the Stockbridge-Munsee Tribe adopted a constitution and bylaws which set forth the basic organization for the exercise of tribal governmental power. Article VII, sec. 1, subsec. (f) of the Tribe's constitution, provides in pertinent part:
 Enumerated Powers — The Tribal Council of the Stockbridge Munsee Community shall exercise the following powers. . . .
. . . .
 (f) To promulgate and enforce ordinances, subject to the approval of the Secretary of the Interior, . . . providing for the licensing of nonmembers coming upon the reservation for purposes of hunting, fishing, trading, or other business, and for the exclusion from the territory of the Community of persons not so licensed.
The tribal constitution was approved by the Secretary of the Interior in compliance with 25 U.S.C. sec. 476.
It is also significant that the Act of July 12, 1960 (74 Stat. 469, 18 U.S.C. sec. 1165) was enacted for the purpose of assisting tribes in their exercise of jurisdiction over hunting, trapping and fishing activities on tribal lands. That statute provides in pertinent part:
 Whoever, without lawful authority or permission, willfully and knowingly goes upon any land that belongs to any Indian or Indian tribe, band, or group and either are held by the United States in trust or are subject to a restriction against alienation imposed by the United States, or upon any lands of the United States that are reserved for Indian use, for the purpose of hunting, trapping, or fishing thereon, or for the removal of game, peltries, or fish therefrom, shall be fined not more that [sic] $200 or imprisoned not more than ninety days, or both, and all game, fish, and peltries in his possession shall be forfeited. *Page 86 
It should also be noted that provisions in Pub.L. No. 280,28 U.S.C. sec. 1360 and 18 U.S.C. sec. 1162, the legislation that authorized the state to exercise general criminal and limited civil jurisdiction over all Indian country in Wisconsin except the Menominee Reservation specifically exclude state regulation of protected hunting and fishing by Tribe members. 18 U.S.C. sec. 1162(b) provides: "Nothing in this section shall . . . deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof."
Based on the Stockbridge-Munsee Tribe's government status, the provisions in the tribal constitution, and the relevant federal statutes, it is my opinion that the Tribe has jurisdiction over hunting and fishing activities on the Stockbridge-Munsee Reservation. See Eastern Band of Cherokee Indians v. N.C.Wildlife, 588 F.2d 75 (4th Cir. 1978); United States v. State ofWashington, 520 F.2d 676 (9th Cir. 1975); and Settler v. LaMeer,507 F.2d 231 (9th Cir. 1974). It is not settled, however, whether such authority is exclusive or concurrent with a state's authority to manage fish and game and resources within its borders.
State jurisdiction to regulate non-Indian hunting and fishing within reservations has been upheld under some circumstances. SeeUnited States v. State of Mont., 457 F. Supp. 599 (D. Mont. 1978); Confederated Tribes, Etc. v. State of Wash., 591 F.2d 89
(9th Cir. 1979). See also United States v. Sanford, 547 F.2d 1085
(9th Cir. 1976). These cases hold that a state has jurisdiction to enforce its fish and game regulations on Indian reservations located within its boundaries against nontribe members unless precluded from doing so by an act of Congress or unless such enforcement would interfere with self-government on the reservation. See also Williams v. Lee, 358 U.S. 217 (1959);Washington v. Confederated Bands and Tribes of the Yakama IndianNation, 439 U.S. 463 (1979).
In Eastern Band of Cherokee Indians, the Fourth Circuit Court of Appeals concluded that enforcement of North Carolina's fishing license requirements against non-Indian fishers on the Tribe's reservation violated federal preemption principles. The court found significant the strong federal policy supporting the Tribe's resource management program which demonstrated an intention to preclude any *Page 87 
state regulation. The Cherokee and the federal government were jointly working toward the development of the Tribe's fishing resource as a commercial enterprise for the Tribe. The state's licensing requirement, the court concluded, would adversely affect those efforts.
Eastern Band of Cherokee Indians has been appealed to the United States Supreme Court. The Court's decision should help clarify the jurisdictional relationship between the states and tribes regarding enforcement of hunting and fishing regulations within reservation boundaries.
I am not aware of any preemptive factors involving the Stockbridge-Munsee that would preclude the state and the Tribe from exercising concurrent jurisdiction over non-Indians on the Stockbridge-Munsee Reservation pending a Supreme Court decision in this jurisdictional area.
It is, therefore, my opinion, that the Stockbridge-Munsee Tribe has the exclusive authority to regulate hunting and fishing activities on tribal land by Tribe members and has concurrent jurisdiction with the state to regulate nonmembers who either reside there or go onto the reservation for such purposes.
As I indicated at the outset, the question of whether the Tribe has exclusive hunting and fishing rights on navigable waters and whether it has the exclusive right to regulate hunting and fishing activities on such waters is currently an issue in the State v. Baker litigation, and consequently, this opinion will not address those issues.
BCL:JN
[1] Called also "right of common." A right exercised by one man in the soil of another, accompanied with participation in the profits of the soil thereof. A right to take a part of the soil or produce of the land. Gadow v. Hunholtz, 160 Wis. 293,151 N.W. 810, 811, Ann. Cas. 1917D, 91.
Black's Law Dictionary, 1376 (4th ed. 1951).