# UNITED STATES *v.* KLAMATH AND MOADOC TRIBES OF INDIANS ET AL.

No. 707.  Argued April 1, 4, 1938.—Decided April 25, 1938.

120

*Assistant Attorney General McFarland,* with whom *Solicitor General Jackson* and *Mr. C. W. Leaphart* were on the brief, for the United States.

*Mr. G. Carroll Todd,* with whom *Messrs. Daniel B. Henderson* and *T. Hardy Todd* were on the brief, for appellees.

MR. JUSTICE BUTLER delivered the opinion of the Court.

Congress, by Act of May 26, 1920,[1] gave to the lower court jurisdiction of claims of respondents against the United States. They sued to recover the value of 87,000 acres of land alleged to have been taken from them by the United States August 22, 1906. The Court of Claims made special findings of fact, stated its conclusion of law and dismissed the case. We affirmed on the ground that the Act did not confer jurisdiction of released claims and that this claim had been released. 296 U. S. 244. Then, by Act of May 15, 1936,[2] the Congress enacted "That in the suit numbered E–346 [this suit] heretofore instituted in the Court of Claims by the Klamath and Modoc Tribes and Yahooskin Band of Snake Indians under an Act . . . approved May 26, 1920, jurisdiction is hereby conferred upon said court, and it is hereby authorized and directed, irrespective of any release or settlement, to re-

---

[1] 41 Stat. 623.
[2] 49 Stat. 1276.

instate and retry said case and to hear and determine the claims of the plaintiffs on the merits, and to enter judgment thereon upon the present pleadings, evidence, and findings of fact, with the right of appeal, rather than by certiorari, to the Supreme Court of the United States by either party: *Provided,* That any payment heretofore made to the said Indians by the United States in connection with any release or settlement shall be charged as an offset, but shall not be treated as an estoppel."

The findings show: In 1864 plaintiffs held by immemorial possession more than 20,000,000 acres located within what now constitutes Oregon and California. By an Act [3] of March 25 of that year the President was authorized to conclude with them a treaty for the purchase of the country they occupied. The treaty was made October 14 following. [4] A proviso sets apart a tract retained out of the country a part of which was ceded, to be held until otherwise directed by the President, as a residence for plaintiffs, with specified privileges. Rights of way for public roads were reserved. [5] Shortly before the treaty was made Congress granted Oregon, to aid in the construction of a military road, the odd-numbered sections for three in width on each side of the proposed road. [6] Oregon accepted the grant and assigned it to the road company which undertook to construct the road. Congress recognized the assignment. [7] Patents were issued to the State and to the road company for in all 420,240.67 acres, title to which was later acquired by a land company. Exclusive of right of way, 111,385 acres so acquired by that company were within the boundaries

[3] 13 Stat. 37.
[4] Ratified July 2, 1866; proclaimed February 17, 1870. 16 Stat. 707.
[5] 16 Stat. 708.
[6] Act of July 2, 1864, 13 Stat. 355.
[7] Act of June 18, 1874, 18 Stat. 80.

of the reservation and had been allotted in severalty to members of the tribe. The United States brought suit but failed to recover that area.[8] Congress by Act of June 21, 1906,[9] authorized the Secretary of the Interior to exchange unallotted lands in the reservation for the allotted lands by mistake earlier conveyed. He made an agreement with the land company pursuant to which, on August 22, 1906, it conveyed the allotted lands back to the United States and in return the latter conveyed to the company 87,000 acres of unallotted lands. That transfer was made without the knowledge or consent of plaintiffs and without giving them any compensation for the lands so taken from their reservation. Later, however, the United States paid them $108,750 for which they released their claim.[10] There was then upon the land 1,713,000,000 board feet of merchantable timber of the value of $1.50 per thousand; the value of the lands including timber was $2,980,000. From that amount the court subtracted the $108,750 and to the remainder added 5 per cent. per annum to date of judgment; from the total took the amount it found the United States entitled to set off against plaintiff's claim (Act of May 26, 1920, 41 Stat. 623, § 2), and as of June 7, 1937, gave judgment for the balance $5,313,347.32, with interest on a part of that amount until paid.

1. The United States contends that the lower court erred in including the value of the timber. The tract taken was a part of the reservation retained by plaintiffs out of the country held by them in immemorial posses-

---

[8] *United States* v. *Dallas Road Co.*, 140 U. S. 599. *United States* v. *California & Oregon Land Co.*, 148 U. S. 31. *United States* v. *California & Oregon Land Co.*, 192 U. S. 355.

[9] 34 Stat. 325.

[10] The release was held valid in *Klamath Indians* v. *United States*, 296 U. S. 244.

sion, from which was made the cession by the treaty of October 14, 1864. The clause declaring that the district retained should, until otherwise directed by the President, be set apart as a residence for the Indians and "held and regarded as an Indian reservation" clearly did not detract from the tribes' right of occupancy. The worth attributable to the timber was a part of the value of the land upon which it was standing. Plaintiffs were entitled to have that element of value included as a part of the compensation for the lands taken. *United States* v. *Shoshone Tribe, ante*, p. 111.

2. The United States also contends that the lower court erred in allowing interest against the United States on the unpaid value of the 87,000 acres from the time of the exchange to the date of the judgment, and to support that contention argues that there was no exercise of the power of eminent domain and that the jurisdictional Act of 1920 limited recovery to the value of the land on the date of the taking, without interest.

It is appropriate first to observe that while the United States has power to control and manage the affairs of its Indian wards in good faith for their welfare, that power is subject to constitutional limitations, and does not enable the United States without paying just compensation therefor to appropriate lands of an Indian tribe to its own use or to hand them over to others. *Chippewa Indians* v. *United States*, 301 U. S. 358, 375, and cases cited. Nor is it quite accurate to say that interest as such is added to value at the time of the taking in order to arrive at just compensation subsequently ascertained and paid. The established rule is that the taking of property by the United States in the exertion of its power of eminent domain implies a promise to pay just compensation, i. e., value at the time of the taking plus an amount sufficient to produce the full equivalent of that value paid contemporaneously with the taking. *Jacobs* v. *United States*,

290 U. S. 13, 16–17, and cases cited. The lands here in question are not the allotted areas making up the 111,385 acres that the United States conveyed by mistake and through error in the conduct of litigation, as its counsel here says, failed to recover.[11]  Plaintiffs seek compensation for the 87,000 acres given to the land company in exchange for the allotted areas which the latter then owned.

Having been informed of the failure of the United States to recover the allotted lands, Congress, by the Act of March 3, 1905, directed the Secretary of the Interior to ascertain "on what terms the said company will exchange such lands [the 111,385 acres of allotted lands] for other lands, not allotted to Indians, within the original boundaries of said reservation." [12]  The Secretary having reported, the Congress by the Act of June 21, 1906 authorized him to exchange 87,000 acres of the tribes' lands for lands theretofore erroneously conveyed.  The exchange having been consummated, Congress by Act of April 30, 1908 [13] appropriated $108,750 as compensation.  That amount was paid plaintiffs in accordance with the Act; they gave the release here held valid, 296 U. S. 244.  The Act of May 15, 1936 followed.

The United States argues that the rule of just compensation does not apply because "the tract was lost by mistake rather than taken by the power of eminent domain."  But as to the 87,000 acres here involved there is no foundation for that assertion.  Unquestionably Congress had power to direct the exchange and for that purpose to authorize expropriation of plaintiffs' lands.  The validity of its enactments is not questioned.  The taking was to enable the Government to discharge its obligation,

---

[11] See footnote 8, *supra.*

[12] 33 Stat. 1033.

[13] 35 Stat. 70.

whether legal or merely moral is immaterial, to make restitution of the allotted lands. The taking was *in invitum,* specifically authorized by law, a valid exertion of the sovereign power of eminent domain. It therefore implied a promise on the part of the Government to pay plaintiffs just compensation. *Jacobs* v. *United States, supra.*

The provision of the Act of 1920 invoked by the United States is: "That if it be determined by the Court of Claims in the said suit herein authorized that the United States Government has wrongfully appropriated any lands belonging to the said Indians, damages therefor shall be confined to the value of the said land at the time of said appropriation. . . ." As shown above, the 87,000 acres were taken by valid exertion of the power of eminent domain. The taking was consummated pursuant to the Act of 1906; it was ratified by appropriation and payment under the Act of 1908. It implied a promise to pay just compensation. Clearly the lands in question were not "wrongfully appropriated."

Moreover the Congress by the Act of May 15, 1936 intended to grant to the plaintiffs the right to have their claim for just compensation under the Constitution for the 87,000 acres judicially determined without regard to the settlement and irrespective of the release.[14] It spe-

---

[14] A letter of the Secretary of the Interior to the Committee on Indian Affairs on the proposed Act of 1936 said in part: "The bill now here seeks to authorize 'effective judicial determination' of the claim of these Indians for the land taken from their reservation and given to the California & Oregon Land Co., which the courts have plainly indicated to have been for an inadequate consideration." H. Rep. No. 2354, 74th Cong., 2d Sess.

The Report of the House Committee on Indian Affairs stated: "The pending bill to amend the jurisdictional act is limited solely to the object of giving effect to this suggestion of the Supreme Court by granting the Klamath tribes the right to have their claim for

cifically directed the lower court to determine the claim of plaintiffs on the merits and to enter judgment thereon "upon the present pleadings, evidence and findings of fact." Unquestionably the findings of fact are sufficient to sustain the judgment.

*Affirmed.*

MR. JUSTICE STONE, MR. JUSTICE CARDOZO, and MR. JUSTICE REED took no part in the consideration or decision of this case.

MR. JUSTICE BLACK concurs in the result.

just compensation under the Constitution for the taking of the 87,000 acres of their lands judicially determined on its merits without regard to the grossly inequitable settlement heretofore made." H. Rep. No. 2354, 74th Cong., 2nd Sess.

. The Report of the Senate Committee on Indian Affairs stated: "The purpose of the bill is to enable these Indian tribes to obtain just compensation for the taking of a part of their reservation in the State of Oregon by the Secretary of the Interior under authority of an Act of Congress approved June 21, 1906." S. Rep. No. 1749, 74th Cong., 2nd Sess.