[Crim. No. 21750. Oct. 8, 1981.]

In re ANDREW WILSON on Habeas Corpus.

COUNSEL

David J. Rapport, Lester J. Marston, Pamela S. Williams, Henry J. Sockbeson, Marilyn B. Miles and Michael S. Pfeffer for Petitioner.

George Deukmejian, Attorney General, Gregory W. Baugher, Bruce S. Flushman, Roderick E. Walston and Charles W. Getz IV, Deputy Attorneys General, for Respondent.

OPINION

**BIRD, C. J.**—May an exception to the law, which otherwise applies equally to every Californian, be carved out for a special class of individuals so that a person may violate, with impunity, a criminal statute which prohibits hunting out of season on public or private land simply because he belongs to an Indian tribe which once occupied the land?

I.

The relevant facts are uncontroverted. Petitioner, Andrew Wilson, is a member of the Atsugewi branch of the Pit River Indians. About 5:30 p.m. on December 8, 1978, he was apprehended by William Fisher, a game warden, with two deer carcasses in his possession. Fisher seized both the deer and a .22 caliber rifle he found in petitioner's truck. Petitioner was cited for unlawful possession of deer taken during closed season in violation of section 2002 of the Fish and Game Code.[1] When apprehended, petitioner was on lands within the aboriginal territory of the Pit River Indians.[2]

At his court trial, petitioner did not dispute the sufficiency of the evidence to establish that he violated section 2002. Instead, he argued that the Pit River Indians' aboriginal hunting rights had not been extinguished. Therefore, he contended that the state could regulate the

---

[1]Section 2002 of the Fish and Game Code provides in pertinent part: "It is unlawful to possess any ... mammal ... taken in violation of any of the provisions of this code, or of any regulation made under it."

[2]The Pit River Indians include two groups: the Achumawi and the Atsugewi Indians. The aboriginal territory of these groups encompasses some 3.4 million acres of land in what is now northeastern California, including parts of Lassen, Modoc, and Shasta Counties. (*Pitt River Indians of California* v. *United States* (1959) 7 Ind.Cl.Com. 815, 844-847; *Thompson* v. *United States* (1964) 13 Ind.Cl.Com. 369, 381; see generally, Olmstead & Stewart, *Achumawi*, and Garth, *Atsugewi*, both in 8 Handbook of North American Indians (Heizer edit. 1978) pp. 225 and 236.) The area near Burney, California where petitioner was apprehended lies within this territory. (See, e.g., Garth, *Atsugewi, supra*, at p. 226.)

Indians' hunting activities within their aboriginal territory only if the regulation met applicable federal standards. (See, e.g., *Antoine* v. *Washington* (1975) 420 U.S. 194 [43 L.Ed.2d 129, 95 S.Ct. 944]; compare, *Kake Village* v. *Egan* (1962) 369 U.S. 60 [7 L.Ed.2d 573, 82 S.Ct. 562, 680].) Since the state could not demonstrate that the regulation at issue was a reasonable and necessary conservation measure, that its application to the Indians was necessary in the interest of conservation, and that it did not discriminate against the Indians (*Antoine* v. *Washington, supra*, at p. 207 [43 L.Ed.2d at p. 139]), petitioner asserted that the law could not be applied to him.

Rejecting this argument, the trial court found petitioner guilty of the offense charged and sentenced him to serve a one-year term of probation with a seven-day work furlough at the California Department of Transportation. Execution of the sentence was stayed pending appeal.

The Appellate Department of the Shasta County Superior Court affirmed petitioner's conviction and refused to certify an appeal. Petitioner now seeks habeas corpus relief. The trial court's stay remains in effect.

## II.

■ Central to petitioner's claim is his assertion that the Pit River Indian aboriginal right to hunt has not been extinguished. Since it is now established that the tribe's aboriginal "right to occupy" their native territory has been extinguished (*United States* v. *Gemmill* (9th Cir. 1976) 535 F.2d 1145, 1148-1149, cert. den. *sub nom., Wilson* v. *United States* (1976) 429 U.S. 982 [50 L.Ed.2d 592, 97 S.Ct. 497]),[3] the precise issue which this court must decide is whether extinguishment of the tribe's Indian title to, or right to occupy, their aboriginal territory operated to extinguish the tribe's aboriginal hunting rights.

---

[3]In *U.S.* v. *Santa Fe Pacific R. Co.* (1941) 314 U.S. 339, 347 [86 L.Ed. 260, 270, 62 S.Ct. 248], the Supreme Court described the federal government's broad power to extinguish the Indian right of occupancy, ordinarily called "Indian title," as follows. "The power of Congress in that regard is supreme." (*Ibid.*) "[W]hether [extinguishment] be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts [citation]" for "[t]he manner, method and time of such extinguishment raise political, not justiciable, issues. [Citation.]" (*Ibid.*) With these propositions in mind, in *Gemmill* the Ninth Circuit reviewed the activity of the federal government toward the Pit River Indians over the period from 1851 to 1964. The court concluded: "the activity of the federal government . . . has included expulsion by force, inconsistent use, and

Petitioner contends these rights are not mere incidents of Indian title but are rights separate therefrom which may be extinguished only pursuant to an express and specific congressional mandate. To assess this contention, it is necessary to review the nature and scope of Indian title and the effect of extinguishment of such title.

Indian title connotes only a permissive right to occupy land, fee title to the land resting with the United States government. (*Oneida Indian Nation* v. *County of Oneida* (1974) 414 U.S. 661, 667 [39 L.Ed. 2d 73, 79, 94 S.Ct. 772]; *Johnson* v. *McIntosh* (1823) 21 U.S. (8 Wheat.) 240, 253-254 [5 L.Ed. 681, 688-689].) Federal case law holds that the Indian right of occupancy is a mere possessory interest, *not* a property right. (*Tee-Hit-Ton Indians* v. *United States* (1955) 348 U.S. 272, 279, 288-289 [99 L.Ed. 314, 320, 324-325, 75 S.Ct. 313].) This interest is incapable of alienation absent federal authorization (*Oneida Indian Nation, supra*, at pp. 667, 669 [39 L.Ed.2d at pp. 79, 80]; *Johnson* v. *McIntosh, supra*, at pp. 261-262 [5 L.Ed. at pp. 693-694]), and it may be extinguished by the federal government at any time (*Oneida Indian Nation, supra*, at p. 670 [39 L.Ed.2d at pp. 80-81]; *U.S.* v. *Santa Fe Pacific R. Co., supra,* 314 U.S. 339, 347 [86 L.Ed. 260, 270, 62 S.Ct. 248]; *Johnson* v. *McIntosh, supra*, at pp. 259-260 [5 L.Ed. at pp. 691-693]).[4]

---

voluntary payment of compensation .... This century-long course of conduct amply demonstrates that the Pit River Indian title has been extinguished." (*United States* v. *Gemmill, supra*, 535 F.2d at p. 1149.)

[4]The second-class status of the Indian has its origins in the doctrine of discovery which delineates the rights acquired by a nation on its discovery of a new territory. The doctrine was adopted by Chief Justice Marshall as the basis of his decision in *Johnson* v. *McIntosh, supra*, 21 U.S. (8 Wheat.) 240, a landmark case on Indian title. As summarized by Chief Justice Marshall, "discovery gave title to the government by whose subjects, or by whose authority, it was made, against all other European governments, which title might be consummated by possession." (*Id.*, at p. 253 [5 L.Ed. at p. 688].) "The rights of the [Indians] were, in no instance, entirely disregarded; but were, necessarily, to a considerable extent, impaired. They were admitted to be the rightful occupants of the soil, with a legal as well as just claim to retain possession of it, and to use it according to their own discretion" (*ibid.*) but discovery gave the discoverer an exclusive right as sovereign to acquire Indian land and thereby "to extinguish the Indian title of occupancy, either by purchase or by conquest" (*id.*, at p. 259 [5 L.Ed. at p. 692]). Thus, until the discoverer exercised its right, both the Indians and the discoverer had concurrent interests in the land: the discover held fee title, the Indians their right of occupancy. Finally, since discovery gave the sovereign alone the right to extinguish Indian title, the Indians' power to alienate their interest was denied (*id.*, at pp. 253-254 [5 L.Ed. at pp. 688-689]). (See generally, Newton, *At the Whim of the Sovereign: Aboriginal Title Reconsidered* (1980) 31 Hastings L.J. 1215, 1220-1226; Note, *Indian Title: The Rights of American Natives In Lands They Have Occupied Since Time Immemorial* (1975) 75 Colum.L.Rev. 655, 657-675.)

Until extinguished, such right of occupancy carries with it full use of the land. "The Indians had command of the lands and the waters—command of all their beneficial use, whether kept for hunting, 'and grazing roving herds of stock,' or turned to agriculture . . ." and other uses. (*Winters* v. *United States* (1908) 207 U.S. 564, 576 [52 L.Ed. 340, 346, 28 S.Ct. 207].)

The scope of Indian title was the central question decided in *Shoshone Tribe* v. *U.S.* (*Shoshone I*) (1937) 299 U.S. 476 [81 L.Ed. 360, 57 S.Ct. 244], and *U.S.* v. *Shoshone Tribe* (*Shoshone II*) (1938) 304 U.S. 111 [82 L.Ed. 1213, 58 S.Ct. 794]. At issue in that litigation was the compensation due the Indians for the taking of a portion of their reservation lands. While the litigation involved a treaty, the treaty was silent regarding the extent of the Indians' rights in the lands.[5] The outcome turned, therefore, on the scope of the Indian tenure prior to the treaty, or, more specifically, on the scope of Indian title. (See generally, Cohen, *Original Indian Title* (1947) 32 Minn.L.Rev. 28, 54-55.)[6]

In *Shoshone I*, Justice Cardozo held that the Shoshones had the "right of occupancy with all its beneficial incidents [citation]." (*Shoshone I, supra*, 299 U.S. at p. 496 [81 L.Ed. at p. 369].) As *Shoshone I* dealt only with fixing the date of the taking and not with damages, the court did not define those incidents, but held that "[t]he right of occupancy is the primary one to which the incidents attach." (*Ibid.*)

---

[5]Under the treaty, the tribe ceded to the United States 44.7 million acres of land and accepted in exchange a reservation of 3.1 million acres which was to be "'set apart for the absolute and undisturbed use and occupation'" of the tribe. (*Shoshone I, supra*, 299 U.S. at p. 485 [81 L.Ed. at p. 363].)

[6]The *Shoshone* litigation is not unusual in this regard. Absent specific language to the contrary in a treaty, congressional enactment, or other document, the Indians' rights in reservation lands generally have been held to be analogous to the rights they enjoyed under Indian title. (See, e.g., *Beecher* v. *Wetherby* (1877) 95 U.S. 517, 525 [24 L.Ed. 440, 441]; *Nadeau* v. *Union Pacific R.R. Co.* (1920) 253 U.S. 442, 446 [64 L.Ed. 1002, 1006, 40 S.Ct. 570]; *Menominee Tribe* v. *United States* (1968) 391 U.S. 404, 405-406 and fn. 2 [20 L.Ed.2d 697, 699, 88 S.Ct. 1705].) The fundamental difference between Indian title and Indian title recognized by Congress pursuant to a treaty, a statute, or by other means is that recognized title is a property right under the Fifth Amendment. Therefore, a taking of the latter title requires compensation, whereas a taking of unrecognized Indian title gives rise to no legally enforceable obligation to make compensation. (*Tee-Hit-Ton Indians* v. *United States, supra*, 348 U.S. 272.)

*Shoshone II* forced the court to answer, at least in part, the question it had avoided in *Shoshone I.* Did the tribe's right of occupancy include timber and mineral resources? The court held that in the absence of an express reservation of such beneficial interest in the United States, the tribe had "the right which has always been understood to belong to Indians" (*Shoshone II, supra,* 304 U.S. at p. 117 [82 L.Ed. at p. 1219]), the right of occupancy with all its beneficial incidents, including the timber and mineral resources. (*Id.,* at pp. 115-118 [82 L.Ed. at pp. 1217-1219]; accord, *U.S.* v. *Klamath Indians* (1938) 304 U.S. 119 [82 L.Ed. 1219, 58 S.Ct. 799].)

Similarly, the right to hunt and to fish has been held to be included within the right of occupancy. (E.g., *Winters* v. *United States, supra,* 207 U.S. at p. 576 [52 L.Ed. at p. 346]; *State* v. *Coffee* (1976) 97 Idaho 905 [556 P.2d 1185, 1189] ["aboriginal title includes the right to hunt and fish"]; *State* v. *Stasso* (1977) 172 Mont. 242 [563 P.2d 562, 563] [following *State* v. *Coffee, supra:* "[h]unting and fishing rights are part and parcel with aboriginal title"]; *United States* v. *State of Minn.* (D.Minn. 1979) 466 F.Supp. 1382, 1385 ["aboriginal hunting, fishing, trapping, or wild ricing rights . . . are mere incidents of Indian title, not rights separate from Indian title"], affd. *sub nom., Red Lake Band of Chippewa Indians* v. *State of Minn.* (8th Cir. 1980) 614 F.2d 1161, cert. den. 449 U.S. 905 [66 L.Ed.2d 136, 101 S.Ct. 279]; *State* v. *Keezer* (1980) — Minn. — [292 N.W.2d 714, 720-721] [following *United States* v. *State of Minn., supra:* "'hunting. . . rights are mere incidents of Indian title'"], cert. den. 450 U.S. 930 [67 L.Ed.2d 363, 101 S.Ct. 1389].)

Moreover, in a number of treaties with the Indians, Congress explicitly recognized the right to hunt as one of the privileges of occupancy. (E.g., Treaty of January 9, 1789, with the Wyandots, 7 Stat. 29 [reserving land to the Indians "to live and hunt upon, and otherwise to occupy as they see fit"]; Treaty of March 28, 1836, with the Ottawas and Chippewas, 7 Stat. 495 [reserving to the Indians the "right to hunt" along with "the other usual privileges of occupancy"].)

No decision has been found wherein a court has taken the view that hunting rights exist "[i]n addition to, and as a distinct right separate from aboriginal title" (dis. opn. of Mosk, J., *post,* at p. 38). It is not surprising that the dissent can cite no authority for its position. The dissent's reliance on *Sac & Fox Tribe of Mississippi in Iowa* v. *Licklider* (8th Cir. 1978) 576 F.2d 145 is misplaced. There, the Eighth Circuit

held that the Sac and Fox tribe lost its aboriginal right to hunt and fish when it ceded to the United States all the lands west of the Mississippi River to which it had any claim or title or interest. (*Id.*, at pp. 151, 153.) No mention was made of the relation between aboriginal hunting rights and aboriginal title. Other courts, construing virtually identical treaty language, have expressly found that such language operated to extinguish a tribe's aboriginal title which included the tribe's hunting and fishing rights. (*United States* v. *State of Minn., supra*, 466 F.Supp. at p. 1385; *State* v. *Keezer, supra*, 292 N.W.2d at pp. 720-721.) Nothing in *Licklider* is to the contrary. Moreover, the Eighth Circuit Court of Appeals, which decided *Licklider*, has affirmed this reasoning. (*Red Lake Band of Chippewa Indians* v. *State of Minn., supra*, 614 F.2d at p. 1162.)

*Menominee Tribe* v. *United States, supra*, 391 U.S. 404, is also misconstrued by the dissent. In *Menominee Tribe*, the Supreme Court construed a treaty granting the tribe a reservation "'for a home, to be held as Indian lands are held.'" (*Id.*, at pp. 405-406 [20 L.Ed.2d at p. 699].) The court held that "the language 'to be held as Indian lands are held' includes the right to fish and to hunt." (*Id.*, at p. 406 [20 L.Ed.2d at p. 699].) In reaching that conclusion, the court noted with approval the rationale of the Wisconsin Supreme Court in *State* v. *Sanapaw* (1963) 21 Wis.2d 377 [124 N.W.2d 41, 44]. (*Id.*, at p. 406, fn. 2 [20 L.Ed.2d at p. 699].) There, this language was construed as the Menominees would have understood it (see *United States* v. *Winans* (1905) 198 U.S. 371, 380-381 [49 L.Ed. 1089, 1092, 25 S.Ct. 662]). As a result, the Wisconsin court held that the tribe would enjoy on the reservation the hunting and fishing rights they had enjoyed on lands held under aboriginal title. (*State* v. *Sanapaw, supra*, 124 N.W.2d 41.) The Supreme Court also noted that this language "sum[s] up in a single phrase the familiar provisions of earlier treaties which recognized hunting and fishing as normal incidents of Indian life. [Citation omitted.]" (*Menominee Tribe, supra*, at p. 406, fn. 2 [20 L.Ed.2d at p. 699].)

*United States* v. *Winans, supra*, 198 U.S. 371, cited by the dissent, is also inapposite. *Winans* construed the treaty by which the Yakima Indians ceded to the United States a portion of their Indian title lands. One clause of the treaty provided that the Indians were to retain, on the ceded lands, inter alia, "'the right of taking fish at all the usual and accustomed places,'" and the right "'of erecting temporary buildings for

curing them' ...." (*Id.*, at p. 378 [49 L.Ed. at p. 1091].)[7] The respondents maintained that this provision secured to the Indians only such fishing rights on the ceded lands as any citizen of the state would have. (*Id.*, at p. 380 [49 L.Ed. at p. 1092].)

Rejecting this construction, the court stated: "At the time the treaty was made the fishing places were part of the Indian country, subject to the occupancy of the Indians, *with all the rights such occupancy gave.* [Italics added.] The object of the treaty was to limit the occupancy to certain lands and to define rights outside of them.... [¶] The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed. New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away." (*Id.*, at pp. 379, 381 [49 L.Ed. at pp. 1091, 1092].) Since "it was within the competency of the Nation to secure to the Indians ... a remnant of [their] great rights ..." (*id.*, at p. 384 [49 L.Ed. at p. 1094]), the court held that the treaty language indicated a congressional intent to secure to the Indians an ongoing right in the ceded land: "the right of crossing it to the river—the right to occupy it to the extent and for the purpose mentioned." (*Id.*, at p. 381 [49 L.Ed. at p. 1093].)[8]

Clearly, none of the cases relied upon by the dissent provides authority for the proposition that aboriginal hunting rights are not incidents of aboriginal title. Further, every case directly addressing the relation between aboriginal title and aboriginal hunting rights holds that *such rights are incidents of aboriginal title.* "[A]boriginal title [is] more

---

[7]Article III of the treaty provided in pertinent part: "The exclusive right of taking fish in all the streams where running through or bordering said reservation, is further secured to said confederated tribes and bands of Indians, as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing them; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land...." (*United States* v. *Winans, supra,* 198 U.S. at p. 378 [49 L.Ed. at p. 1091].)

[8]The Supreme Court recently reaffirmed the *Winans* court's construction of the treaty language and further concluded that the language secured to the Indians, in addition, a fair share of the available fish. (*Washington* v. *Fishing Vessel Assn.* (1979) 443 U.S. 658, 674-685 [61 L.Ed.2d 823, 838-845, 99 S.Ct. 3055].)

than just a right to remain camped on the land." (*State* v. *Coffee, supra*, 556 P.2d 1185, 1188.) It is the right to any and all beneficial uses of the land. It is the right of the Indians to live and hunt upon the land and otherwise to occupy it as they see fit. The case law is clear. Hunting and fishing rights are an incident of the right of occupancy, an incident of aboriginal title. If aboriginal title is ceded to the government, the right to hunt and fish on those lands is gone. Emotions might dictate an opposite result, but this court must follow the law.

It is equally well established that extinguishment of Indian title, if absolute and unconditional, vests in the United States or its grantee an "absolute title" unrestricted by Indian rights. (*Johnson* v. *McIntosh, supra*, 21 U.S. (8 Wheat.) at pp. 259, 261 [5 L.Ed. at pp. 692, 693].) "[W]henever the Indian right of occupancy [is] terminated (if such termination [is] absolute and unconditional) the [owner] of the fee ... acquire[s] a perfect and unburdened title and right of possession." (*Minnesota* v. *Hitchcock* (1902) 185 U.S. 373, 389 [46 L.Ed. 954, 963, 22 S.Ct. 650]; accord, *United States* v. *State of Minn., supra*, 466 F.Supp. at p. 1385; *State* v. *Keezer, supra*, 292 N.W.2d at pp. 720-721; see also *Rosebud Sioux Tribe* v. *Kneip* (1977) 430 U.S. 584, 592 [51 L.Ed.2d 660, 668, 97 S.Ct. 1361]; *DeCoteau* v. *District County Court* (1975) 420 U.S. 425, 445-446 [43 L.Ed.2d 300, 314-315, 95 S.Ct. 1082].) If, however, the extinguishment of Indian title is qualified, or limited, that portion excepted from extinguishment survives. (*United States* v. *Winans, supra*, 198 U.S. 371 [see *ante*, at p. 29; *State* v. *Coffee* (1976) 97 Idaho 905 [556 P.2d 1185, 1192-1193].) Therefore, under the law, if the extinguishment of the Pit River Indian title was absolute and unconditional the Indians' occupancy rights, including their hunting rights, were abolished.[9]

*Menominee Tribe* v. *United States, supra*, 391 U.S. 404, is not to the contrary. The dissent argues that this case stands for the proposition that hunting rights are extinguished only if Congress acts specifically and unequivocally to extinguish them. (See dis. opn. of Mosk, J., *post*, at p. 39.) The rule of construction applied by *Menominee Tribe* is that "'the intention to abrogate or modify a treaty is not to be lightly imputed to the Congress.'" (*Menominee Tribe, supra*, at p. 413 [20 L.Ed.2d at p. 703].) As interpreted by the Supreme Court, the case clearly es-

---

[9]*State* v. *Keezer, supra*, 292 N.W.2d 714, 720-721, expressly rejected the contention, made here by the dissent, that extinguishment of aboriginal title eliminates only real property rights and not a tribe's hunting and fishing rights.

tablishes that in construing treaties, the focus of the inquiry is on congressional intent. (See *Washington* v. *Yakima Indian Nation* (1979) 439 U.S. 463, 478, fn. 22 [58 L.Ed.2d 740, 754, 99 S.Ct. 740]; *Washington* v. *Fishing Vessel Assn., supra*, 443 U.S. at p. 690 [61 L.Ed.2d at p. 848].) The court will consider all relevant indicia of that intent: "[W]hether a congressional determination to terminate is 'expressed on the face of the (relevant) Act(s) or [is] clear from the surrounding circumstances and legislative history.' [Citation omitted; brackets in original.]" (*Rosebud Sioux Tribe* v. *Kneip, supra*, 430 U.S. 584, 588, fn. 4 [51 L.Ed.2d 660, 666]; see generally, Coggins & Modrcin, *Native American Indians and Federal Wildlife Law* (1979) 31 Stan.L.Rev. 375, 384.)

Indeed, this is precisely the inquiry undertaken by the court in *Menominee Tribe.* The court looked first to the face of the Menominee Termination Act. It found language which provided that upon termination of federal supervision over the tribe and its property, "'the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other[s]' ...." (*Menominee Tribe, supra*, 391 U.S. at p. 410 [20 L.Ed.2d at p. 701].) This forcefully suggested an intent to submit the hunting and fishing rights of the Indians to regulation by the State of Wisconsin. (*Ibid.*) The court then looked to the surrounding circumstances and legislative history. In so doing, the court discovered that "[t]he same Congress that passed the Termination Act also passed Public Law 280 ..." which became effective well in advance of the Termination Act and at a time when the Menominee Reservation was still part of Indian country. (*Id.*, at pp. 410-411 [20 L.Ed.2d at pp. 701-702].) That law granted Wisconsin, among other states, jurisdiction over offenses committed by Indians in Indian country. However, the law further provided that it was not meant to deprive any Indian of any right or immunity provided under a treaty "'*with respect to hunting, trapping, or fishing* or the control, licensing, or regulation thereof.'" (*Ibid.* [italics in original].)

Considering the two acts *in pari materia*, the court concluded that although Congress intended federal supervision of the tribe to cease and all tribal property to pass to a corporation formed by the tribe, it also intended to preserve the tribe's hunting and fishing rights. (*Id.*, at p. 411 [20 L.Ed.2d at p. 702]; see also, *Kimball* v. *Callahan* (9th Cir. 1974) 493 F.2d 564, 567-569.)

In seeking to determine whether aboriginal rights have been extinguished, the nature of the inquiry is much the same. The question is congressional intent. (See *U.S.* v. *Santa Fe Pacific R. Co., supra,* 314 U.S. 339.) Accordingly, this court must consider whether the legislative history reveals a congressional determination to extinguish the Pit River Indian title in its entirety which would include the tribe's hunting rights.

A review of the "century-long course of conduct" by which the federal government extinguished the Pit River Indian title (*U.S.* v. *Gemmill, supra,* 535 F.2d at p. 1149) leads inescapably to the conclusion that the Indians' occupancy rights have been extinguished in their entirety. To relate the manner in which this extinguishment was carried out is to set forth a dismal chapter in the history of this nation and in the history of this state.

California was admitted to the Union on September 9, 1850. (9 Stat. 452.) Thereafter, Congress began to debate what steps to take to remove the Indians of California from contact with the horde of gold seekers who had begun flooding the state, so as to reduce the friction between the two groups. (Heizer, *Treaties,* in 8 Handbook of North American Indians, *supra,* p. 702.)[10]

In 1852, Congress enacted legislation authorizing President Fillmore to appoint commissioners to negotiate treaties with the California tribes. He did so, and subsequently these commissioners negotiated 18 treaties with many of the California Indians. (*Ibid.*)[11] Each of the treaties followed the historical pattern. Certain lands were to be set aside for the Indians; the rest were to be ceded to the United States. (*Ibid.*) At least some of the treaties apparently contained a provision reserving to the Indians hunting rights in the ceded lands. (See 4 Kappler, Indian Affairs—Laws and Treaties (1929) pp. 1081-1128.)

Soon after the provisions of the treaties became known, the California Legislature adopted resolutions opposing their ratification. (See

[10]Gold seekers entered the Pit River Indian territory in 1851; they were soon followed by settlers. (Garth, *Atsugewi,* in 8 Handbook of North American Indians, *supra,* at p. 243.)

[11]The commissioners did not treat with the Pit River Indians for lack of an interpreter. (*Pit River Indians* v. *United States, supra,* 7 Ind.Cl.Com. at p. 828.) Nevertheless, two of the treaties purported to cede the tribe's aboriginal territory to the United States. (*Ibid.*)

generally, Ellison, *Rejection of the California Indian Treaties. A Study in Local Influence on National Policy*, in Treaty Making and Treaty Rejection by the Federal Government in California, 1850-1852 (Heizer edit. 1978) pp. 50, 54-59.) The Legislature wanted the Indians removed to reservations outside the state. (*Id.*, at p. 56.) Largely because of the opposition of the Legislature and the senators from California, the United States Senate refused to ratify the treaties, on July 8, 1852. The United States Senate placed the treaties under an injunction of secrecy which was not removed for over 50 years. (Heizer, *Treaties*, in 8 Handbook of North American Indians, *supra*, at p. 703.)

In March of 1852, Congress passed an act establishing a "superintendency of Indian affairs" in California. (10 Stat. 2.) When the treaties were rejected, Congress authorized the expenditure of a sum of money for the preservation of peace with the Indians who had been dispossessed of their lands as a result of the abortive attempt to establish treaties. (10 Stat. 56.) Also, the Congress wanted to prevent the starvation of the Indians. (Ellison, The Federal Indian Policy in California, 1846-1860 (1976) at pp. 204-205.)[12]

In 1852, the superintendent, Edward F. Beale, reported that "some adjustment of the Indian question was necessary, as white people were fast filling up the habitable territory to the exclusion of the Indians." (*Id.*, at p. 206.) Beale recommended in 1853 that Congress establish several "military reservations" to which the Indians could be removed. Such reservations were to be established on unoccupied lands, with the understanding that if the growth in the Caucasian population required it, the location of these properties would be changed. (*Id.*, at pp. 206-212.) Congress adopted this recommendation[13] and apparently pursued the policy into the 1870's. (*Id.*, at pp. 212-230; see *U.S.* v. *Forty-Eight Pounds of Rising Star Tea* (N.D.Cal. 1888) 35 F. 403; see generally, Tyler, A History of Indian Policy (1973) at p. 7.)

---

[12]Apparently, a number of Indians had been removed to the reservations suggested in the treaties prior to the rejection of the treaties by Congress. (Ellison, *supra*.)

[13]By the Act of March 3, 1853 (10 Stat. 238), the President was authorized to establish five military reservations in California or in nearby Territories on lands not inhabited by "citizens" of California. The act also appropriated monies "to defray the expense of subsisting the Indians of California and removing them to said reservations for protection ...." Subsequent annual appropriation bills embodied this policy. (E.g., 10 Stat. 332, 698; 11 Stat. 183; 12 Stat. 57, 236, 790.) Congress from time to time changed the authorized number and location of the reservations. (See Act of 1854, 10 Stat. 332 [reducing the number of reservations to three, all in California]; Act of

The influx of Caucasians into the Pit River Indians' territory continued and a series of conflicts followed. In the 1850's and the 1860's the government undertook concentrated military action against the Indians. In 1859, all of the Indians who could be found were removed to the Round Valley Reservation. (*Pitt River Indians* v. *United States, supra*, 7 Ind.Cl.Com. 815, 852.) By 1863, many of these Indians had left the reservation and the conflict continued until, in 1867, the Indians were "decisively overcome" at the Battle of the Infernal Caverns. (*Id.*, at pp. 852, 862; see also *United States* v. *Gemmill, supra*, 535 F.2d 1145, 1148.) As a result, the Pit River Indians "have not been in physical possession of [much of their aboriginal territory] for 100 years...." (*United States* v. *Gemmill, supra*.)[14] These events, considered in light of the federal government's general policy toward the Indians of California, strongly indicate an intent on the part of Congress to completely extinguish the Indian title of the Pit River Indians.

Finally, from a legal standpoint the question concerning the extinguishment of the tribe's Indian title was "decisively resolved by congressional payment of compensation to the Pit River Indians for these lands." (*United States* v. *Gemmill, supra*, 535 F.2d at p. 1149.)[15] In the 1950's, the tribe filed a claim for compensation for the taking of their Indian title with the Indian Claims Commission. (See 25 U.S.C. § 70a(4).)[16] In 1959, the commission found that their Indian title had been taken (*Pitt River Indians* v. *United States, supra*, 7 Ind.Cl.Com. at p. 862), and in 1964, the commission approved a compromise final settlement of the Pit River Indian claim and that of other California Indian tribes. (*Thompson* v. *United States, supra*, 13 Ind.Cl.Com. at p. 513.)

March 3, 1855, 10 Stat. 699 [authorizing two additional reservations in California]; Act of April 8, 1864, 13 Stat. 40 [allowing a change in location and reducing the number of reservations to four].)

[14]Apparently some small parcels of this land were returned to individual Indians under the General Allotment Act of 1887. (See 25 U.S.C. § 331 et seq.) In addition, a ranch in Modoc County was purchased for the Achumawi branch in 1940. (Garth, *Atsugewi*, and Stewart, *Litigation and Its Effects*, both in 8 Handbook of North American Indians, *supra*, at pp. 243, 705.)

[15]In 1946, Congress passed the Indian Claims Commission Act (25 U.S.C. § 70 et seq.) "to settle all meritorious [Indian] claims ... whether those claims were of a legal or equitable nature which would have been cognizable by a court of the United States ... or whether those claims were of a purely moral nature *not* cognizable in courts of the United States under any existing rules of law or equity." (*Otoe and Missouria Tribe of Indians* v. *United States* (Ct.Cl.1955) 131 F.Supp. 265, 275 [italics in original].)

[16]Subdivision (4) of section 70a provides, in pertinent part, for the determination of "claims arising from the taking by the United States ... *of lands owned or occupied*

The settlement agreement provided that "entry of final judgment shall finally dispose of all claims or demands which any of the [Indians] have asserted or could have asserted against [the United States] . . . and [*the Indians*] . . . *shall be barred from asserting all such claims or demands in any future action.*" (*Id.*, at p. 386; italics added.) Congress immediately appropriated the funds to pay the settlement. (Act of October 7, 1964, 78 Stat. 1033; *Andrade* v. *United States* (Ct.Cl. 1973) 485 F.2d 660, 661.) As the Ninth Circuit observed in *Gemmill*, "[p]ayment of the Pit River claim eliminates any lingering doubt that by 1964 Congress had [extinguished] the Indians' *rights of permissive occupancy*. [Italics added.]" (*United States* v. *Gemmill, supra*, 535 F.2d at p. 1149.)[17]

The federal government's course of conduct unquestionably establishes that extinguishment of the Pit River Indian title was absolute and unconditional. When the tribe's Indian title was extinguished, so too, under the law, were the tribe's aboriginal hunting rights.[18]

---

by the claimant without the payment for such lands of compensation . . . ." [Italics added.] Thus, the commission was empowered to hear and determine cases involving the taking of a tribe's Indian title. (*Otoe & Missouria Tribe of Indians* v. *United States, supra*, 131 F.Supp. at p. 276.)

It should be noted that the legislative history of the Indian Claims Commission Act reveals a concern on the part of Congress that the act be worded so as to permit suit by the California Indians. (*Id.*, at pp. 277-283 [recounting the legislative history of the act].) Congress apparently believed that their Indian title had been appropriated. (*Id.*, at p. 281.)

[17]Contrary to petitioner's assertion, the history of this litigation demonstrates that it was premised upon the uncompensated taking of the Pit River Indians' entire occupancy rights, i.e., their Indian title, and that the compensation paid was for those rights, the value of which has long been held to be equivalent to the fair market value of the land. (See *Pitt River Indians* v. *United States, supra*, 7 Ind.Cl.Com. at p. 862; *Thompson* v. *United States* (1959) 8 Ind.Cl.Com. 1, 28 [related case]; *Thompson* v. *United States, supra*, 13 Ind.Cl.Com. 369.)

[18]Given this conclusion, it is not necessary to address the second issue presented by this appeal, i.e., whether the standard enunciated in *Antoine* v. *Washington, supra*, 420 U.S. 194 (see *ante*, at p. 24) applies to state regulation of aboriginal hunting rights. It should be noted, however, that *Kake Village* v. *Egan, supra*, 369 U.S. 60, is the most recent Supreme Court case which addresses the power of the state to regulate aboriginal hunting and fishing rights. In that case, two communities of Thlinget or Tlinget Indians, for whom no reservation had been provided, sought to enjoin Alaska from enforcing against them a statute prohibiting the use of fish traps. The Indians asserted that they were exercising their aboriginal right to fish in using the traps. The Supreme Court affirmed the dismissal of the Indians' suit after observing that "[t]his Court has never held that States lack power to regulate the exercise of aboriginal Indian rights. . . ." (*Id.*, at p. 76 [7 L.Ed.2d at p. 584].) The court at no point indicated that

### III.

"Every American ... knows that the [Indian] tribes of this continent were deprived of their ancestral ranges by force and that, even when the Indians ceded millions of acres by treaty ..., it was ... the conquerors' will that deprived them of their land." (*Tee-Hit-Ton Indians* v. *United States, supra*, 348 U.S. at pp. 289-290 [99 L.Ed. at pp. 325-326].) However, this court is precluded by law from questioning the justness of these actions. (*U.S.* v. *Santa Fe Pacific R. Co., supra*, 314 U.S. at p. 347 [86 L.Ed. at p. 270].) "[O]ur task here is a narrow one.... [W]e cannot remake history." (*DeCoteau* v. *District County Court, supra*, 420 U.S. at p. 449 [43 L.Ed.2d at p. 317].)

The federal case law and the history of the federal government's policy toward Indian title to California property clearly establish that the Pit River Indians retain no special hunting rights. Therefore, the state is not required by law to make any special showing to justify application of its hunting regulations to the Indians within their aboriginal territory.

Although this court is precluded from granting the relief sought by petitioners, neither the Legislature nor the Fish and Game Commission face the same legal impediments. Either one of these bodies could grant limited hunting privileges on these ancestral lands consistent with the requirements of conservation. (See *Elser* v. *Gill Net Number One* (1966) 246 Cal.App.2d 30, 35 [54 Cal.Rptr. 568]; see also *Washington* v. *Fishing Vessel Assn., supra*, 443 U.S. 658, 673, fn. 20 [61 L.Ed.2d 823, 837-838].) This court commends such a course to those two governmental bodies.

Emotion and sympathy, however well intentioned, cannot properly play a role in this court's resolution of this legal issue. Since the law allows no other recourse, the order to show cause is discharged and the petition for a writ of habeas corpus is denied.

---

the state was required to make any special showing to justify the application of its regulations to the Indians.

Tobriner, J., Richardson, J., Rouse, J.,\* and Franson, J.,\* concurred.

**MOSK, J.**—I dissent.

Where the majority stray from both reality and the law is in equating hunting and fishing rights with ownership of real property. They are clearly distinguishable; the waiver or extinction of one does not compel elimination of the other unless specifically provided. There is no such provision here.

Indeed there is virtually no relationship between title to real property and hunting and fishing. Anyone familiar with outdoor life is aware that such activities are seldom undertaken on or limited by the boundaries of real property owned by the hunter and fisherman. Venison on the hoof and peripatetic trout are unlikely to feel circumscribed by metes and bounds.

Real property is immovable; it consists of land and that which is affixed to land (Civ. Code, § 658), such as timber (*McAdams* v. *McElroy* (1976) 62 Cal.App.3d 985 [133 Cal.Rptr. 637]; *McKeever* v. *Locke-Paddon Co.* (1922) 58 Cal.App. 51 [207 P. 1040]), fixtures (Civ. Code, § 660; *Bank of America Nat. Trust & Sav. Assn.* v. *Los Angeles County* (1964) 224 Cal.App.2d 108 [36 Cal.Rptr. 413, 6 A.L.R.3d 491]), gas, oil and minerals (*Cox* v. *United States* (9th Cir. 1976) 537 F.2d 1066) and water flowing in its natural channel (Civ. Code, § 662; *Fudickar* v. *East Riverside I. Dist.* (1895) 109 Cal. 29, 36 [41 P. 1024]). In short, the code defines land as "the material of the earth, whatever may be the ingredients of which it is composed, whether soil, rock, or other substance . . . ." (Civ. Code, § 659.)

Personal property is generally limited to visible, tangible, movable chattels, i.e., objects of the senses, deliverable in specie. (*Italiani* v. *Metro-Goldwyn-Mayer Corp.* (1941) 45 Cal.App.2d 464, 467 [114 P.2d 370].)

Hunting and fishing rights are neither real nor personal property; they are a distinct category of property, incorporeal in nature, broadly comparable to choses in action, products of the mind (Civ. Code, § 980; *Johnston* v. *Twentieth Century-Fox Film Corp.* (1947) 82 Cal.App.2d 796 [187 P.2d 474]), the right to practice a profession (*Hewitt* v. *State*

---

\*Assigned by the Chairperson of the Judicial Council.

*Board of Medical Examiners* (1906) 148 Cal. 590 [84 P. 39]), causes of action (*Neale* v. *Depot Railway Co.* (1892) 94 Cal. 425 [29 P. 954]), and the good will of a business (Civ. Code, § 655).

With definitions clearly in mind the issue before us becomes relatively simple: when a party bargains away or otherwise is deprived of his real property rights and no more, does he thereby automatically suffer extinction of other incorporeal rights unrelated to real property? A negative answer seems compelled: a right remains a right until specifically eliminated by agreement, unequivocal waiver, or appropriate legislative enactment.

The United States Supreme Court has recognized that the federal government has the Big Brother power to extinguish the Indian right of occupancy, commonly known as "Indian title." (*United States* v. *Santa Fe Pacific R. Co.* (1941) 314 U.S. 339, 347 [86 L.Ed. 260, 270, 62 S.Ct. 248].) This is based on a theory, no longer open to us to question, that Indian title is primarily a permissive right to occupy certain land but the fee title remains with the United States government. (*Oneida Indian Nation* v. *County of Oneida* (1974) 414 U.S. 661, 667 [39 L. Ed.2d 73, 79, 94 S.Ct. 772].) Thus Indian title, or aboriginal title, differs from what we commonly know as fee title.

In addition to, and as a distinct right separate from aboriginal title and the "right of occupancy," there has been an historically recognized and unrestricted aboriginal right to hunt and fish. (*Sac & Fox Tribe of Mississippi in Iowa* v. *Licklider* (8th Cir. 1978) 576 F.2d 145, 153; *United States* v. *Winans* (1905) 198 U.S. 371, 381 [49 L.Ed. 1089, 1092-1093, 25 S.Ct. 662].)

It is a well-established tenet of federal law that neither the existence of aboriginal title nor the separate right to hunt and fish are dependent upon a grant from the federal government. As the United States Supreme Court has stated: "Nor is it true, as respondent urges, that a tribal claim to any particular lands must be based upon a treaty, statute, or other formal government action." (*United States* v. *Santa Fe Pacific R. Co., supra*, 314 U.S. 339, 347 [86 L.Ed. 260, 270].) The term "Indian title" or "aboriginal title" means the right is derived from ancestral occupancy to a specified land area, not by means of a grant from the government.

While these ancestral rights—occupancy, and hunting and fishing—are not dependent upon a grant, they can be eliminated by government action. For example, in *Sac & Fox Tribe of Mississippi in Iowa* v. *Licklider, supra*, 576 F.2d at pages 151, 153, the circuit court found that by formal treaty, the tribe relinquished not only its possessory interest but also its aboriginal right to hunt and fish. (Also see *United States* v. *Winans, supra*, 198 U.S. 371, 381 [49 L.Ed. 1089, 1092-1093].)

The only manner in which "Indian title" can be extinguished is through explicit extinguishment pursuant to a "clear and plain" congressional mandate. (*United States* v. *Santa Fe Pacific R. Co., supra*, 314 U.S. 339, 353-354 [86 L.Ed. 260, 273-274]; *Menominee Tribe* v. *United States* (1968) 391 U.S. 404 [20 L.Ed.2d 697, 88 S.Ct. 1705]). As was emphasized in *Menominee Tribe*, hunting rights exist independently from occupancy rights. Therefore, before tribal hunting rights are extinguished, Congress must also specifically and unequivocally extinguish them; this cannot be accomplished by conjecture or inference.

The United States Commission on Civil Rights recognized in its June 1981 report that "tribes may retain hunting and fishing rights in lands ceded to the United States in cases where no mention of such rights is made in a treaty." Citing *Menominee Tribe*, the federal agency agrees that if hunting and fishing rights are not specifically terminated "when the tribal-Federal relationship was ended" the states are prevented from applying their game laws on the former reservation. (Indian Tribes: A Continuing Quest for Survival, Report of the United States Commission on Civil Rights (June 1981) pp. 44-45.)

In the case at hand, no congressional act can be identified by which the aboriginal hunting rights of the Pit River Indians have been extinguished. Moreover, the Appellate Department of the Shasta County Superior Court found as a fact that "the federal government has never abrogated or extinguished by treaty or statute, the tribe's aboriginal fishing and hunting rights."

It is true that the Pit River Indians have lost title to their aboriginal lands (*United States* v. *Gemmill* (9th Cir. 1976) 535 F.2d 1145), but in that process, and in arriving at a settlement thereafter with the government, it was clear that the agreement only "revoked the Indians' rights of permissive occupancy" (*id.*, p. 1149). No mention was made in the settlement, nor did *Gemmill* declare that any explicit or implicit under-

standing was reached, to eliminate the Indians' independent right to hunt and fish. As was stated recently in *United States v. Dupris* (8th Cir. 1979) 612 F.2d 319, 323, "[D]iminishment of a reservation should only be found where the intent of Congress for such diminishment is clear and unambiguous."

Cases cited by the majority are not apposite. In *United States v. State of Minn.* (D.Minn. 1979) 466 F.Supp. 1382, the court found as a fact that the Indians there involved "were told that under the Nelson Act they would not retain special hunting and fishing rights in ceded areas ...." (*Id.*, p. 1387.) *United States v. Shoshone Tribe* (1938) 304 U.S. 111 [82 L.Ed. 1213, 58 S.Ct. 794] involved mineral rights, which everyone concedes are part of real property.

The Supreme Court case of *Menominee Tribe v. United States, supra*, 391 U.S. 404, convincingly undermines the majority's conclusion both in result and in rationale. The act of Congress there involved was by its terms "to provide for orderly termination of Federal supervision over the property and members" of the tribe, and thereafter "the laws of the several States shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction." Justice Douglas, for the court, declared, "We decline to construe the Termination Act as a backhanded way of abrogating the hunting and fishing rights of these Indians." (*Id.*, at p. 412 [20 L.Ed.2d at p. 703].) The court conceded the power to abrogate those rights exists (*Lone Wolf v. Hitchcock* (1903) 187 U.S. 553, 564-567 [47 L.Ed. 299, 305-307, 23 S.Ct. 216]) but an intention to do so "'is not to be lightly imputed to the Congress.' [Citation.]" (*Id.*, at p. 413 [20 L.Ed.2d at p. 703]; also see *Kimball v. Callahan* (9th Cir. 1974) 493 F.2d 564.)

The following quotation from *Fishing in Western Washington—a Treaty Right, a Clash of Cultures*, Indian Tribes: A Continuing Quest for Survival, A Report of the United States Commission on Civil Rights (June 1981) page 99, aptly relates the problem: "The fishing rights conflict is very much a study in frustration. Indian tribes have been fighting for their economic survival throughout this century. When non-Indian institutions, like courts and legislatures of the State and Federal governments upon which they have had to rely, have failed them, they have lost their promised rights. When some of those institutions have supported them, the battle itself has been moved to a different forum. The struggle, like the fish, is cyclical and ongoing. It requires tribes to

be ever vigilant to protect their fishing rights from many forms of direct attack as well as indirect assault. Through all the battles, they must move with caution. They are a political minority with assets envied by others. They have had to pay law firms and technical experts in order to retain their rights, and they have had to deal extensively with all branches of State and Federal governments in order to give lasting effect to last century's promises. The situation is perhaps most easily summarized by the remark of one Indian fish manager: 'Well, ... if they could get the politics out of the management of the fish, we'd have some.'"

It is anomalous that my colleagues in the majority have been willing to give unprecedented and, in my opinion unconstitutional, economic and educational preferences to specifically enumerated minorities, some of whom may have been recent arrivals in the state (see, e.g., *DeRonde v. Regents of University of California* (1981) 28 Cal.3d 875 [172 Cal. Rptr. 677, 625 P.2d 220]; *Price* v. *Civil Service Com.* (1980) 26 Cal.3d 257 [161 Cal.Rptr. 475, 604 P.2d 1365]), but they are unmoved by the attempted exercise of historically recognized rights of a minority people whose presence here antedates all of us.[1] One must ponder the political vigor of the former (see my dissent in *DeRonde*, p. 901) compared to the pathetic impotency of the numerically insignificant Pit River Indians.

From the colonial era to this very day, the dominant society has over-reacted to Indian lore, as if it were a volatile threat to our security. This overrated danger, wrote the eminent historian W. E. Woodward, "has become a sort of historical myth" (Woodward, A New American History (1938) p. 105). Yet we have an unpaid debt to the Indians, if for no other reason than it was from them, who out of the need for survival were adept in the arts of hunting and fishing, that the early settlers on this continent learned and perfected their techniques of acquiring food for sustenance and material for clothing and shelter. (Beard, A Basic History of the United States (1944) p. 25.) We can best repay that obligation by broadening our perspective to welcome the existence of the diverse Indian culture, by encouraging rather than penalizing cherished traditions and by enhancing rather than disparaging the Indians' sense of personal dignity.

---

[1] Indeed, most unusual for a majority opinion, it devotes almost as much printed space to an effort to rebut this dissent as it does to justify its own conclusion.

This petitioner and his fellow tribesmen should prevail—on the strength of their legal, moral and historical rights. I would issue a writ of habeas corpus.

**NEWMAN, J.,** Dissenting.—I concur in the dissent, except that I do not share views proclaimed in Justice Mosk's antepenultimate paragraph.

Petitioner's application for a rehearing was denied November 13, 1981. Mosk, J., was of the opinion that the application should be granted.